**Kimberly Joy CROWDER f/k/a Kimberly Joyce Rearden, Appellant,**

v.

**James Mark REARDEN, Appellee.**

No. 2007–CA–002604–MR.[1]

Court of Appeals of Kentucky.

Oct. 9, 2009.

---

1. This is a companion appeal to *Rearden v. Rearden*, 296 S.W.3d 438 rendered this same date. This appeal pertains to a contempt motion while *Rearden* focuses on the classification of property and assignment of debt following dissolution of the parties' marriage.

446

C. Thomas Hectus, Louisville, KY, for Appellant.

Patricia Tierney Kidd, Louisville, KY, for Appellee.

Before LAMBERT and NICKELL, Judges; HENRY,[2] Senior Judge.

*OPINION*

NICKELL, Judge.

Kimberly Joy Crowder, formerly Rearden (Kimberly), appeals from two orders entered on June 21, 2007, in which the Jefferson Circuit Court found her in contempt for "failing to cooperate with the

**2.** Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

sale of the marital residence and for failing to pay her portion of the mortgage." As a result of being found in contempt, Kimberly, a cardiac surgical nurse, was sentenced to thirty days in jail, but served only five days with work release; the remaining time was probated for two years on the condition that she comply with the court's orders. Kimberly also appeals from an order entered on November 27, 2007, denying her motion to alter, amend or vacate [3] the June 2007 order. She claims her expenses exceeded her finances making it impossible for her to comply with the court's orders that she pay a portion of the monthly mortgage for the marital home and therefore the trial court abused its discretion in finding her in contempt of court. After reviewing the record and the law, we affirm.

## FACTS

In December 2005, after just six months of marriage, James Rearden (James) petitioned the court to dissolve his marriage to Kimberly. The couple had no children and the only contested issues in the dissolution were whether particular items should be classified as marital or non-marital property, division of marital debt and restoration of non-marital property. A major sticking point was the sale of the marital home. Kimberly's unwillingness to cooperate with realtors, despite specific court orders to do so, and her failure to pay her share of the mortgage were the bases for the contempt proceeding.

On May 1, 2005, while an unmarried man, James placed a down payment on a house in Louisville, Kentucky, that would become the marital home. The down payment was in the form of a $3,000.00 check drawn on his individual pre-marital money market account with the Navy Federal Credit Union (NFCU). The purchase price of the home was $299,900.00. James

and Kimberly married in California on May 20, 2005, and closed on the Louisville home on June 2, 2005, while both were still in California. The home was purchased solely in James's name, using his unblemished credit, because Kimberly had previously declared bankruptcy.

The couple separated briefly in mid-November of 2005, James filed a petition to dissolve the marriage, they reconciled, and finally separated on December 6, 2005. James left the marital home on that date and did not return. On March 7, 2006, the trial court entered an agreed order stating in part: (1) the house shall be placed on the market for sale; (2) each party shall sign a listing agreement for the marital home as soon as possible; (3) Kimberly, who was living in the home, shall keep the house in good order "so that it can be shown to [prospective] purchasers upon notice[;]" and (4) Kimberly shall "cooperate w/[the realtor] as to showings."

According to realtor Vicki Satterwaite, the home was listed in March 2006, but was shown only four times during the initial weeks when Satterwaite expected eight to ten showings. Having to work with Kimberly to show the home was "tough" according to Satterwaite because they had to give her a day's notice of any visits, and phone messages left on Kimberly's cell phone were not promptly returned, often after the time for showing the home had expired. Most troubling was Kimberly's use of a chain on the front door which prevented realtors from using an exterior lock box to facilitate showings. At a hearing in September 2006, Satterwaite testified she did not consider Kimberly to be a motivated seller and ultimately her firm agreed to be released from listing the property.

---

**3.** The motion was filed pursuant to Kentucky Rules of Civil Procedure (CR) 59.05.

Against this backdrop, in September 2006, James brought a show cause motion against Kimberly for failing to cooperate in the sale of the house. As grounds for the motion, James stated a new listing agreement had not been signed; Kimberly refused to list the home for less than her appraised price of $325,000.00 even though it was previously listed at $318,500.00 [4] and had not sold; and Kimberly missed an appointment with Marvin Dever whom James had asked to appraise the home. Trial was already scheduled for September 29, 2006, and the contempt motion was passed until that time.

In the wake of trial, the court signed an order on October 3, 2006, directing both parties to sign a listing agreement in the amount of $309,000.00 that day. On October 6, 2006, the court entered the couple's dissolution of marriage.

Six days later, James noticed a motion to be heard on October 16, 2006, requiring Kimberly to show cause for her failure to pay fifty percent of the mortgage by the first of each month as ordered on January 25, 2006. On October 18, 2006, the court entered findings of fact and conclusions of law stating in part, the parties were ordered to sign a listing agreement for the home at $309,000.00 on October 6, 2006; Kimberly may remain in the home until it is sold; Kimberly is to pay three-quarters of the mortgage, as well as routine maintenance, upkeep and utilities and James is to pay one-quarter of the debt beginning November 1, 2006. The court also found Kimberly in contempt "for her willful disregard of Court Orders related to the sale of the marital home. [She] may purge herself of contempt by following all current and subsequent Court orders and by fully cooperating in the sale of the home.

[Her] failure to purge herself of contempt may result in additional sanctions." Although this was a final and appealable order, Kimberly did not file an appeal.

In a separate order entered the same day, the trial court set a hearing for January 12, 2007, at which Kimberly was to explain her failure to make timely mortgage payments. This second order compelled her to pay her share of the mortgage by the first of the month and granted James common law judgments against Kimberly for her portion of the mortgage, plus any late fees that might be assessed due to the missed payments. A third order entered on the same date directed Kimberly to cooperate with the listing agent she herself had selected and to allow open houses as suggested by the realtor.

Yet another order was entered on November 22, 2006, setting a show cause hearing for Kimberly to explain her continued use of an interior door chain despite an order that she cease use of the device. The same order made Kimberly "the sole obligor on the monthly mortgage payment . . . commencing on December 1, 2006 and continuing monthly there after (sic) on the first of each month." Kimberly moved to set aside this order claiming she had not received notice of the motion until the order had already been entered. The motion to vacate was set to be heard on December 14, 2006. The record provided to us contains neither a recording of the hearing nor an order resolving Kimberly's motion.

James filed additional show cause motions in January, February and March 2007 on many of the grounds already asserted. Kimberly made her last mortgage payment in February 2007, but failed to

---

4. The home was originally listed for $324,900.00, but was reduced a few weeks later to $318,500.00. Listing agents suggested dropping the price to $313,500.00, but Kimberly refused. Kimberly's appraisal listed the home's value at $325,000.00. James's appraisal listed the home's value at $309,000.00.

pay the correct amount. The following month, without notifying anyone, she leased an apartment, ceased making mortgage payments, and abandoned the marital home even though the order of October 18, 2006, made her responsible for maintenance, upkeep and utilities. On March 28, 2007, James's NFCU accounts were frozen due to the default on the home mortgage. His attempts to pay his part of the mortgage were rejected by the NFCU because Kimberly was not paying her portion of the mortgage. Late fees were assessed due to the default.

In April 2007, Kimberly moved the court to allow her to relinquish the marital home because she "no longer desires to live in said property and cannot afford the mortgage payments." On April 3, 2007, the trial court entered two orders—one denying the motion to relinquish and the other setting a show cause hearing for June 15, 2007, and directing Kimberly to sign the listing agreement for the sale of the home and to cooperate with the realtor. On May 22, 2007, a foreclosure action was instituted against James.

Judge Paula Sherlock presided over the June 15 hearing in Judge O'Reilly's absence. She entered an order prepared by James's attorney on June 21, 2007, finding Kimberly to be in contempt and (1) awarding James a common law judgment for $5,984.00 (Kimberly's share of the mortgage arrearage) plus interest and requiring Kimberly to fully reimburse James for any deficiency that might be assessed against him due to the default; (2) ordering Kimberly to serve thirty days in jail for destroying James's credit by not paying her portion of the house mortgage; (3) ordering Kimberly to reimburse James for his travel expenses from Florida to Louisville to attend the contempt hearing; (4) making Kimberly solely responsible for any deficiency levied against the marital home since November 2006 as a result of

her failure to sign the listing agreement despite a court order to do so; (5) awarding James's attorney a common law judgment for $1,200.00 with interest against Kimberly for attorneys' fees pertaining to the contempt motions; and (6) requiring Kimberly to pay the realtor's inspection fee of $100.00, repair a broken window, and mow and water the lawn.

While Judge Sherlock made handwritten annotations on and signed the tendered order, she then prepared and signed her own order which added the following findings and conclusions of law: Judge O'Reilly originally found Kimberly in contempt for her "willful disregard of Court Orders related to the sale of the marital home" on October 16, 2006. In that same order, Kimberly was ordered to pay seventy-five percent of the marital home mortgage, but she has refused to make any payment since February 2007 and the home is now in foreclosure. In an order entered on April 3, 2007, Judge O'Reilly again directed Kimberly to sign the listing agreement so the marital home could be placed on the market. As of the June 2007 contempt hearing, Kimberly still had not signed the agreement. While the court had made Kimberly responsible for maintaining the home, without notice to James or the court, she abandoned the property, disconnected the utilities, made no provision for lawn care in her absence, and took the only keys and garage door openers with her. After being found in contempt during the June 15 hearing, the court gave Kimberly until 6:00 p.m. that evening to turn over the keys and garage door openers and to sign the listing agreement which she finally did. The court had previously ordered that Kimberly would be responsible for any additional deficiencies resulting from her failure to pay her share of the mortgage, however, in its second order, the court reserved its ultimate ruling on this particular item. The second order

signed by Judge Sherlock was also entered on June 21, 2007.

Kimberly moved to vacate these orders alleging she did not make the mortgage payments due to "economic necessity" and arguing that holding her in contempt for her failure to pay was "grossly unfair." She claimed she lacked the "financial ability" to continue living in the marital residence and faulted James for not paying the entire mortgage, even though he had the financial means to do so, and allowing NFCU to foreclose on the home. On November 27, 2007, Judge O'Reilly entered an order denying Kimberly's motion to alter, amend or vacate the court's order of June 21, 2007. In December of 2007, James filed an affidavit for an order of garnishment of Kimberly's wages in the amount of $18,643.95. This appeal followed. We affirm.

## ANALYSIS

The issue before us is whether the trial court abused its discretion in sentencing Kimberly to serve jail time for willfully disregarding its orders. Kimberly claims the court erred for three reasons. First, the court jailed her solely for nonpayment of her portion of the mortgage without determining she had the ability to pay. Second, Kimberly's failure to comply with the trial court's orders was not the result of willful disregard or disrespect, but rather impossibility. Third, the court did not require James to mitigate his damages. James, on the other hand, characterizes Kimberly's allegations of error as just the latest installment in an ongoing pattern of willful disrespect for the court's orders and her placement of blame on everyone but herself. After reviewing the record and the law, we have determined the trial court was extremely patient with Kimberly and did not abuse its discretion in finding her in contempt for failing to obey its multiple directives. Therefore, we reject Kimberly's claims.

We begin with a statement of the law regarding contempt. A trial court has inherent power to punish individuals for contempt, *Newsome v. Commonwealth*, 35 S.W.3d 836, 839 (Ky.App.2001), and nearly unfettered discretion in issuing contempt citations. *Smith v. City of Loyall*, 702 S.W.2d 838, 839 (Ky.App.1986). We will reverse a finding of contempt only if the trial court abused its discretion in imposing the sentence. *Meyers v. Petrie*, 233 S.W.3d 212, 215 (Ky.App.2007). Abuse of discretion is defined as conduct by a court that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999) (citing 5 Am.Jur.2d Appellate Review § 695 (1995)); See also *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 684 (Ky.1994).

Contempt is the "willful disobedience of—or open disrespect for—the rules or orders of a court." *Commonwealth v. Burge*, 947 S.W.2d 805, 808 (Ky.1996). Contempt may be either civil or criminal, depending upon the reason for the contempt citation. *Id.* Civil contempt, the focus of this appeal, is "the failure ... to do something under order of court, generally for the benefit of a party litigant." *Id.* Thus, courts have inherent power to impose a sanction for a civil contempt to enforce compliance with their lawful orders. *Blakeman v. Schneider*, 864 S.W.2d 903, 906 (Ky.1993). While one may be sentenced to jail for civil contempt, it is said the contemptuous one carries the keys to the jail in her pocket, because she is entitled to immediate release upon her obedience to the court's order. *Campbell v. Schroering*, 763 S.W.2d 145, 148 (Ky. App.1988).

Whether civil or criminal, a party cannot be punished for contempt for her failure to perform an act which is impossible. *Blakeman*, 864 S.W.2d at 906. The

inability to comply must be shown clearly and categorically by the defendant, and the defendant must prove he took all reasonable steps within her power to insure compliance with the court's order. *Id.*

■ In the case *sub judice*, the trial court's decision to impose a jail sentence for civil contempt was not an abuse of discretion. Kimberly was first found in contempt for failing to follow court orders in October 2006 and was warned that additional sanctions could be imposed if she did not comply with future court orders. She was given the opportunity to purge herself of contempt but she did not. From October 2006 until a second contempt hearing in June 2007, Kimberly continued to disregard court orders in that she did not make mortgage payments and when she did make payments they were often late or for the wrong amount; she refused to sign the listing agreement so the home could be shown to prospective buyers; she thwarted realtor efforts to show the home by using an interior door chain; she abandoned the home without giving notice to anyone; and she did not maintain the home in her absence. It is particularly egregious that Kimberly did not sign the listing agreement for many months, and ultimately signed the document only after the court had again found her in contempt and told her she would be serving five days in jail. The record contains sufficient proof to refute any claim of abuse of discretion. *English,* 993 S.W.2d at 945.

■ Next, Kimberly's claim of impossibility is unconvincing. First, she erroneously states, "the contempt finding was based *solely* upon her *failure* to pay, *without regard to whether she has the financial ability to pay.*" From our reading of the order, she was found to be in contempt for three reasons, not one—"her willful failure and refusal to pay her portion of the mortgage ... her willful failure and refusal to sign the listing agreement ... [and] her willful failure to maintain the property." She was specifically sentenced to serve thirty days "[f]or her continued contempt of Court Orders to pay her share of the mortgage, to cooperate with the sale of the property, and to maintain the property." Thus, she was not found in contempt or sentenced to serve jail time solely for nonpayment of her portion of the mortgage.

Furthermore, while she claims it was impossible for her to pay the mortgage due to her financial circumstances, the October 2006 order was based upon a review of her finances as submitted in the mandatory case disclosure filed with the court. Since she did not appeal that order, we reasonably conclude she was satisfied with it and allowed it to become final without challenge. Kimberly made full mortgage payments in November and December of 2006, and again in January of 2007. She made a payment in February 2007, but not for the correct amount. Thus, it appears she had the ability to pay her portion of the mortgage.

Then, without offering any proof of a change in circumstances—she was still working at Jewish Hospital where she earned about $45,000.00 [5] annually—and without giving notice to anyone, she unilaterally chose to abandon the home and cease making any mortgage payments. Had Kimberly appealed the October 2006 order, or asked for relief supported by proof, the court may have reconsidered its prior orders. However, she did neither of those things. Instead, she abandoned the home without making any provision to se-

---

**5.** Kimberly could increase her income by accepting more on-call work. According to the mandatory case disclosure filed with the circuit court on May 15, 2006, her gross monthly income was $3,000.00. In an affidavit she signed in June 2007, she said she earned about $45,000.00 in 2006.

cure or maintain it, and then after the home was standing vacant, she filed a motion to relinquish the home which was denied. James did not learn the home was vacant, unsecured, and not being maintained until the show cause hearing on June 15, 2007. Having exercised none of her reasonable options, Kimberly could not successfully assert a defense of impossibility because she did not prove she did anything, let alone everything reasonable, to comply with the court's orders. *Blakeman*, 864 S.W.2d at 906.

 Finally, in a novel argument, Kimberly asserts she should not be held accountable for destroying James's credit rating and not paying her share of the mortgage because James did not mitigate his damages. In her view, James had enough money from his job, military retirement and investments, to pay the full mortgage and avoid having the house fall into foreclosure, so she could ignore the October 2006 order to pay her portion of the debt. In an ironic twist, she makes this argument without offering any proof that James could actually access sufficient funds to pay the full mortgage, the very thing she claims the court erroneously did when holding her in contempt.

As James notes in his brief, Kimberly has not cited any dissolution case in which a party has been required to mitigate damages so a former spouse could avoid being held in contempt. James may have had sufficient funds to pay the entire mortgage, but we do not know that because no proof was offered. Furthermore, the court had not ordered James to pay the full amount of the mortgage; he was responsible for only one-quarter of the mortgage which he tried to pay. Kimberly has not given us good reason to require James to mitigate damages in this scenario.

For the foregoing reasons, we affirm the trial court's orders finding Kimberly in contempt and imposing a jail sentence.

ALL CONCUR.