RENDERED: JULY 1, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-0142-MR

JULIE LOCKE          APPELLANT

v.      APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE DENISE BROWN, JUDGE
ACTION NO. 13-CI-500046

MATTHEW SALLEE AND NICOLE
COOK          APPELLEES

AND

NO. 2018-CA-0257-MR

JULIE LOCKE          APPELLANT

v.      APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE DENISE BROWN, JUDGE
ACTION NO. 13-CI-500046

MATTHEW SALLEE          APPELLEE

AND

NO. 2018-CA-0500-MR

JULIE LOCKE                                                APPELLANT


                  APPEAL FROM JEFFERSON CIRCUIT COURT
v.                HONORABLE DENISE BROWN, JUDGE
                  ACTION NO. 13-CI-500046


MATTHEW SALLEE                                             APPELLEE


AND


NO. 2018-CA-0501-MR

JULIE LOCKE                                                APPELLANT


                  APPEAL FROM JEFFERSON CIRCUIT COURT
v.                HONORABLE DENISE BROWN, JUDGE
                  ACTION NO. 13-CI-500046


MATTHEW SALLEE                                             APPELLEE


AND


NO. 2018-CA-0782-MR

JULIE LOCKE                                                APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.                 HONORABLE DENISE BROWN, JUDGE
ACTION NO. 13-CI-500046

MATTHEW SALLEE AND NICOLE
COOK                                                                                        APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  JONES, MAZE, AND L. THOMPSON, JUDGES.

JONES, JUDGE:  This consolidated appeal comes to us following a series of

orders entered by the Jefferson Family Court as part of an ongoing custody and

timesharing dispute between Matthew Sallee and Julie Locke, the parents of two

minor children, T.S. and L.S.[1]  In Appeal No. 2018-CA-0142, Julie appeals the

family court's December 20, 2017 order finding her in contempt of court for

failing to abide by the family court's prior parenting time orders as well as the

family court's order regarding payment of the guardian *ad litem* ("GAL") fee; Julie

also appeals the part of the order denying her motion for a video copy of the

children's testimony from August 31, 2017.[2]  In Appeal No. 2018-CA-0257, Julie

---

[1]  Although these appeals were filed in 2018, the parties engaged in rather protracted motion
practice before this Court resulting in the appeals being assigned as part of this panel's August
2021 cases.

[2]  Julie's notice of appeal also states that she is appealing the family court's January 25, 2018
order denying her Kentucky Rule of Civil Procedure ("CR") 59.05 motion to alter, amend, or

-3-

appeals the family court's February 6, 2018 order sentencing Julie to thirty days incarceration, discharged for two years on the condition that Julie comply with all court ordered parenting time, following her failure to purge herself of the contempt for violating the court's prior parenting time orders. In Appeal No. 2018-CA-0500, Julie appeals the family court's February 27, 2018 order revoking her conditional discharge and ordering her to be incarcerated for two days for her continued violation of the parenting time orders. In Appeal No. 2018-CA-0501, Julie appeals the March 8, 2018 order of the family court denying Julie's motion to be provided with a copy of the children's *in camera* and sealed avowal testimony. Finally, in appeal No. 2018-CA-0782, Julie appeals the family court's denial of her motion seeking to terminate Nicole Cook as the children's GAL and its order directing her to pay GAL Cook's fees associated with collecting the past due amounts from Julie. For the reasons set forth below, we affirm the Jefferson Family Court's orders in all respects.

## I. BACKGROUND

Matthew and Julie were married in Louisville, Kentucky, on December 30, 2004. They share two daughters together, T.S., born in 2004, and

---

vacate the December 20, 2017 order. The primary purpose of a CR 59.05 motion is to allow parties to call errors of law and fact to the trial court's attention prior to appeal. However, "there is no appeal from the denial of a CR 59.05 motion. The denial does not alter the judgment. Accordingly, the appeal is from the underlying judgment, not the denial of the CR 59.05 motion." *Ford v. Ford*, 578 S.W.3d 356, 366 (Ky. App. 2019) (emphasis omitted).

L.S., born in 2008.  Matthew and Julie separated in January 2013, at which time Julie filed a petition for dissolution of the marriage.  As part of the dissolution, the parties agreed to share joint legal custody of the children.  They also agreed to a rather detailed parenting plan, which delineated the time the children were to spend with each parent, including schedules for vacations and holidays.  On March 21, 2013, the family court entered a final decree of dissolution of marriage, which incorporated the parties' property settlement agreement, including their agreement on custody and timesharing.

Since entry of the decree, the parties have been in near constant litigation regarding custody and timesharing of the two children.  The record is voluminous, consisting of eight bound volumes totaling over a thousand pages and hundreds of additional pages of exhibits.  We have painstakingly reviewed the entire record.  While the issues on appeal are specific to certain orders entered by the family court in late 2017 and early 2018, it is necessary to understand the parties' history, as many of Julie's arguments focus on prior events and orders.

On or about September 28, 2014, the parties were at a local bowling alley to celebrate L.S.'s birthday.  Matthew and Julie began arguing about timesharing in front of the children.  Julie's then-current husband asked Matthew to leave.  The argument spilled out into the parking lot where the parties continued to argue in front of the children.  Julie loaded the children into her van over

Matthew's objection. At some point during the altercation, Matthew threatened Julie, forcibly opened the door of Julie's vehicle, and then grabbed Julie by the arm in an attempt to remove her from the vehicle. The next day, Matthew visited the children's school where Julie was employed as a counselor. Matthew had lunch with L.S., but T.S. apparently did not want to see Matthew. Matthew located T.S. who was soon joined by Julie. Matthew was persistent in his desire to speak to T.S., but he eventually left the school after being asked to do so numerous times by other school officials.

The following day, September 29, 2014, Julie acting on behalf of herself and the children, sought an emergency protective order ("EPO") against Matthew. The EPO was granted and a hearing was scheduled. Following the hearing, the court granted Julie a DVO against Matthew; the DVO was not granted with respect to the children since there was no showing that Matthew committed an act of domestic abuse against them. However, Julie was temporarily awarded full custody of the children, and Matthew's parenting time was reduced such that he was not permitted to have overnight visits with the children. Matthew was also ordered to attend anger management therapy.

Matthew complied with the court's order. In December 2014, Matthew moved the family court to appoint a GAL for the children and to restore or expand his parenting time. The family court declined to restore Matthew's

parenting time but appointed Rexena Napier as a GAL for the children. Matthew was ordered to pay all of GAL Napier's fees.

On June 15, 2015, Matthew again moved the family court to expand his parenting time. In support of his motion, Matthew averred the following: Child Protective Services ("CPS") had completed an investigation and ultimately did not substantiate any of the allegations;[3] he had completed an individual counseling assessment and had participated in counseling with T.S.; he had several unsupervised visitations with the children without incident; and he was concerned that a prolonged period of time with no overnight visits would cause an insurmountable deterioration of his relationship with the children. Julie objected to the motion. Following a hearing, the family court temporarily granted Matthew's motion allowing him overnight visits with the children as part of his mid-week and weekend parenting time.[4] (Record ("R.") at 169.)

In October 2015, a dispute arose between the parties regarding payment of GAL Napier's fee. In the course of adjudicating this dispute, the family court acknowledged that it was clear from the record that the parties prior agreement was that Matthew was to pay all of the GAL's fees. As a result, the

---

[3]  A report was made to CPS in relation to the events of September 28 and 29, 2014.

[4]  Pursuant to the DVO, Matthew had timesharing with the children every Wednesday and every other weekend.

family court ordered Matthew to pay for all the GAL's past-billed fees. However, the family court ordered that "[g]oing forward, if the parties choose to utilize a [GAL], then each party shall be responsible for one-half of the fees." (R. at 315.) Julie did not contest this order or request termination of the GAL at that time.

In February 2016, GAL Napier filed a motion with the family court seeking an order for the children to be re-enrolled in therapy with Dr. Anne Hammon. GAL Napier indicated that, upon her recommendation and with the agreement of their parents, the children began therapy with Dr. Hammon in January 2015. GAL Napier believed the therapy was beneficial for the children. However, in January 2016, Dr. Hammon refused to schedule appointments for the children more than a week in advance due to frequent missed appointments and cancellations by Julie. At the end of January 2016, Julie informed GAL Napier that T.S. would be seeing a new therapist, Dr. Meagan Marcum. GAL Napier expressed her concern that this change was prompted by Dr. Hammon's decision to begin scheduling regular joint therapy sessions with Matthew and T.S. Ultimately, the family court ordered that the parties were to enroll the children in therapy with Dr. Kathryn Berlá, that the parties were to follow all treatment recommendations, and that the parties were to comply with Dr. Berlá's service agreement.

In September 2016, Matthew moved the family court to restore his custody rights such that the parties would resume as joint legal custodians of the

children. Matthew averred that Julie had used her status as temporary sole custodian to minimize his role in the children's lives, preventing him from accessing school records and participating in matters such as parent-teacher conferences, and that her decisions were often made with the objective of sowing discord between Matthew and the children. Shortly thereafter, with the assistance of counsel, the parties, including GAL Napier, entered into an agreed order restoring joint custody and redefining some of the parameters established by the DVO to allow Matthew to attend school events and pick the children up from school.[5]

Shortly thereafter, Julie discharged her prior counsel, obtained new counsel, and moved to set aside the agreed order as well as to replace GAL Napier with a new GAL. Julie alleged GAL Napier was biased and unprofessional towards the children. This prompted GAL Napier to move the family court to allow her to withdraw as GAL. GAL Napier asserted it was her belief that Julie's motion and allegations were prompted by Julie's disagreement with GAL Napier's recommendations regarding Matthew's requests to be more involved. She explained that any time a professional disagreed with Julie, she sought to turn the

---

[5] This was necessary because Julie worked as a counselor at the children's school, and under the DVO Matthew was not permitted to be on school grounds. The modification allowed Matthew to enter school grounds for purposes related to the children but still required him to maintain a distance of 500 feet from Julie.

children against the professional, as had occurred with Dr. Hammon and Dr. Berlá. Although GAL Napier denied any wrongdoing, she stated that it was her belief that "continued litigation [regarding the GAL] will only pull the children further into the conflict and provide further avenue for the children to be involved in the litigation . . . therefore it is in the children's best interest that [GAL Napier] remove herself as a point of conflict and distraction from the relevant issues."

By orders entered on November 17, 2016, the family court allowed GAL Napier to withdraw and appointed Nicole Cook to serve as the children's new GAL. The family court also entered an order for a family assessment by a psychologist, Dr. Jennifer D. Cebe, regarding "the parties' parenting schedule of their children." Specifically, Dr. Cebe was ordered to investigate and report to the family court her findings and recommendations regarding each party's ability to care for the minor children, and provide a suitability study and make recommendations regarding the parties' parenting time arrangements.

On January 23, 2017, Julie moved the family court to suspend Matthew's timesharing with the children until further order of the court. Julie's motion was accompanied by an affidavit in which she recounted certain events that allegedly occurred on December 27, 2016, during, before, and after Matthew's timesharing with the children. She asserted that, prior to going to Matthew's house for the night, T.S. texted her paternal grandfather (the parental go-between)

-10-

seeking permission to stay at a friend's house that evening. According to Julie, Matthew was angry at the children for wanting to miss their timesharing with him. She stated that Matthew spent the evening "screaming at" the children. She contended that the discord continued into the next day, and that Matthew was still visibly angry when it was time for them to leave. Julie claimed that in his anger Matthew slammed the car door on L.S.'s hand. Matthew did not seek medical care for L.S., whose hand Julie described as swollen and bruised. Julie took L.S. to Norton's Children's Medical Group - Brownsboro, where x-rays were taken and L.S.'s hand "was splinted." Julie further averred that L.S. treated with an unnamed "pediatric/orthopedic physician" on January 3, 2017, who diagnosed a fracture and placed L.S.'s hand in a cast. Julie included a video of the children resisting timesharing with Matthew and behaving anxiously when it was time for their grandfather to pick them up for their next timesharing with Matthew.

Matthew objected to Julie's motion, but acknowledged that he accidently closed the car door on L.S.'s hand. He vehemently denied that his actions were intentional or out of anger at the child. He also denied that L.S.'s hand appeared to need medical attention. He stated that GAL Cook had obtained L.S.'s medical records, and she had advised him that the records contained no statements by L.S. to medical professionals that she believed Matthew's actions were intentional. He also asserted the x-rays did not indicate a fracture to L.S.'s

hand. Matthew asked the family court to seal the video made by Julie during the drop-off because he did not believe its inclusion was in the children's best interest. GAL Cook later filed copies of the certified medical records she received from Norton.

Next, on January 23, 2017, GAL Cook filed a motion with the family court seeking to prohibit the parties from discussing the case with the media and/or to prohibit contact between the media and the children. GAL Cook noted several prior occasions when Julie used social media or other more traditional forms of media, such as television and newspaper, to discuss the specifics of her disagreements with Matthew. GAL Cook did not believe trying the parties' dispute in the court of public opinion would be in the children's best interests. Julie objected to the motion.

Julie's motion to suspend parenting time and the GAL's motion to prohibit discussions with the media came before the family court for a hearing on February 9, 2017. The family court denied Julie's motion to suspend Matthew's parenting time after concluding that the December 27, 2016, incident "was accidental in nature and resulted in minimal injury" to L.S. The family court also denied GAL Cook's motion regarding the media with the caveat that "if either party chooses to do so, the court may consider [discussions of the case with the media and/or the children] as a factor when making any future determination as to

-12-

the best interests of the children." Julie filed a motion to set aside the family's order, which was subsequently denied.

In May 2017, GAL Cook filed a motion to hold Julie in contempt based on her failure to pay her portion of the GAL's fees pursuant to the family court's October 19, 2015 order, which required the parties to split future GAL fees. GAL Cook noted that prior to filing the motion she attempted to resolve the billing issue with Julie by sending her monthly invoices and through letters asking for payment. GAL Cook averred that she had only received a $600 retainer from Julie and that as of the date of her motion, Julie owed $2,283.46 for previously incurred fees.[6]

In June 2017, after disagreements concerning Matthew's timesharing, Matthew filed a motion asking the family court to enter an order granting him "make-up parenting time," enforcing the holiday parenting schedule, and requiring Julie to pay the attorney's fees he incurred in filing the motion.

On June 22, 2017, the family court entered an order addressing several of the outstanding motions. First, the family court denied Julie's CR 60.02(b) motion seeking to set aside the family court's March 1, 2017 order. In this motion, Julie argued that certain medical records, which were submitted to the

---

[6] GAL Cook supplemented her motion in August 2017, noting that as of the most recent billing statement dated July 26, 2017, Julie owed her $2,362.84.

court following the order, constituted "newly discovered" evidence. The family court disagreed that the medical records constituted newly discovered evidence, noting that they were in existence at the time of the hearing and the parties were aware of them. The family court also rejected Julie's argument that GAL Cook committed fraud on the court relating to the hearing when she failed to have the children testify at the hearing and when she did not advocate for a cessation of Matthew's parenting time as the children wanted her to do. The family court noted that there was no fraud on the court because it was aware of the children's desire to testify and their opinions on spending time with Matthew. The family court specifically pointed out that GAL Cook was responsible for advocating for the best interests of the children but was not beholden to their wishes, and that GAL Cook's refusal to comply with the wishes of the children did not in any way reflect an intent to commit fraud on the court. The family court also pointed out that it had previously interviewed the children and was aware of their desire not to spend time with Matthew. The family court noted that it had "significant concerns over the legitimacy of these beliefs given [Julie's] behavior and influence over [the children]" such that the children's statements and wishes had "little probative value to the court . . . due to the court's questions as to their validity." (R. at 536.)

The family court granted Matthew's motion to enforce the holiday schedule but noted that the schedule was somewhat ambiguous as to which party

-14-

was to have had the children on Memorial Day. Because Julie had the benefit of spending Memorial Day with the children, the family court ordered that Matthew was to have the children over the Labor Day holiday. Given the ambiguity, the family court denied Matthew's motion for attorney's fees. Finally, the family court ordered that the parties were to continue with the current orders relating to parenting time. Julie was directed not to deny Matthew's parenting time "for any reason, without written court order." (R. at 538.) Julie was warned that her failure to comply with the family court's directive not to interfere with Matthew's parenting time would open the door for Matthew to move to modify the parenting schedule so that the children would reside primarily with him.

On June 20, 2017, Matthew moved the family court to enter an order designating him as the primary residential parent. In his motion, Matthew explained that the family court had previously awarded him make-up parenting time to take place on June 17, 2017. He stated that Julie was evasive when Matthew's proxy (his father) tried to confirm that Julie planned to make the children available on June 17, and that Julie's lawyer likewise failed to respond with assurances that Julie was going to comply with the order. Matthew stated that his father arrived on June 17 at the appropriate time and location to collect the children, but Julie never arrived with the children, prompting Matthew's father to call her. During that call, Julie informed Matthew's father that the children were

refusing to go. Matthew's father then went to Julie's home to get the children, but they would not voluntarily go with him. During this time, the children spoke to Matthew on the telephone telling him that "they are never coming for any visits anymore." On Father's Day, the children again refused to go with Matthew. Their refusal led to another phone call between Matthew and the children, which Julie surreptitiously recorded after suggesting that the children would be more comfortable if the call was conducted over speakerphone. In his motion, Matthew expressed his belief that Julie was manipulating the children to their detriment by seeking to minimize his role as their father. He believed Julie's behavior was prompted by Julie's loss of several motions seeking to suspend Matthew's parenting time.

Next, Matthew filed a motion to hold Julie in contempt for her repeated violations of the family court's orders relating to parenting time. He asserted that, contrary to the family court's prior orders and despite being ready and available, he had not had parenting time with the children since June 14, 2017. He stated that Julie refused to make the children available despite his father showing up to collect them for each scheduled visitation.

On August 1, 2017, after recounting the parties' extensive and acrimonious litigation history, the family court passed GAL Cook's motion to hold Julie in contempt to the upcoming August 31 hearing, and ordered GAL Cook to

address certain concerns Julie raised regarding GAL Cook's failure to meaningfully consult with the children and possible conflicts of interest. The Court also passed Matthew's motion to hold Julie in contempt for failure to follow the parenting schedule. Finally, the family court ordered that pending the August 31 hearing, Matthew was to have parenting time with the younger child every weekend from Friday evening to Monday morning. Given the older child's "significant mental health problems," the family court did not require her to attend parenting time with Matthew prior to the August 31 hearing but allowed her to do so if she so desired. Due to Julie's acknowledged anxiety and her alleged inability to control the children's behavior, the family court ordered Julie to enroll in therapy with a new provider within seven days of entry of the court's order. Lastly, the parties were ordered to immediately enroll the older child in therapy with Dr. Meagan Marcum, with the primary goal of stabilizing the child's mental health and with the secondary goals of creating a healthy relationship with Julie and healing her relationship with Matthew.

The hearing on the outstanding motions began on August 31, 2017, as scheduled, but it did not finish that day and was continued to September 6, 2017. During the hearing, the Court conducted a private in chambers interview of the children. The interview was recorded and placed in the record under seal.

-17-

Before resumption of the hearing, Julie filed a motion pursuant to KRS[7] 26A.020 seeking to have the family court judge recused. As a basis for the motion, Julie averred that the children were upset and traumatized after their interview with the judge because the judge expressed skepticism with respect to their negative characterization of Matthew and their beliefs about the injuries to L.S.'s hand after the car door incident. Julie alleged that the judge had "erroneously prejudiced [Julie's] credibility and the credibility of [the children]" and that the judge's allegedly harsh treatment of the girls in chambers "further traumatized T.S. and L.S. who come to court as traumatized children." Chief Justice Minton denied Julie's motion. Nevertheless, the motion delayed action in the case, causing the continuation of the August 31 hearing to be rescheduled for November 30, 2017.

Not surprisingly, several additional motions were filed by the parties in the interim, including Julie's motion seeking to be provided with a complete video record of the August 31, 2017 hearing, inclusive of the judge's interview of the children. GAL Cook objected to the parties being provided a copy of the video but noted that the parties and/or their counsel could view the video at the courthouse. Citing Julie's prior contact with the media, GAL Cook was apprehensive that Julie or her counsel planned to publicize the interview, which

_____

[7] Kentucky Revised Statutes.

-18-

she believed would be detrimental to the children. For his part, Matthew filed additional motions with the court seeking to hold Julie in contempt for continuing to obstruct his parenting time.

A contempt hearing was scheduled for December 11, 2017, at which Julie was ordered to appear and show cause why she should not be held in contempt for violating the family court's previous parenting time orders, including its November 7, 2017 order. Following the hearing, the family court entered an order on December 20, 2017, finding Julie in contempt based on her repeated failure to comply with the parenting time schedule previously ordered by the court. The family court generously ordered that Julie could "purge herself of contempt" by following all parenting time orders completely without telling the children that she was doing so under the threat of jail time, enrolling herself in individual therapy as previously ordered by the court, completing the initial therapy intake appointment prior to the next hearing in January 2018, and making sure the children remained enrolled in therapy and attended all their scheduled therapy appointments. Julie was warned that her failure to purge herself of contempt as ordered could result in additional sanctions, including potential incarceration of up to one hundred eighty days.

In the same order, the family court granted GAL Cook's pending motions to hold Julie in contempt for failure to pay her share of GAL Cook's fees.

Again, the family court provided Julie with an opportunity to purge herself of the contempt by bringing the fees current before the parties' March 2018 hearing date.

Lastly, the family court addressed Julie's request to be provided a video copy of the children's testimony from the August 31, 2017 hearing. The family court concluded that there was a high likelihood that allowing Julie or her counsel to have a copy of the video would result in sensitive information about the children being released to the public. Additionally, the family court noted that it was unnecessary for Julie to have a physical copy of the video since the footage could be easily viewed in the video room at the courthouse or certified directly from the clerk's office for any appeals.

Following a hearing on January 31, 2018, the family court entered an order finding that Julie did not purge herself of the contempt. Specifically, the family court found that as a result of Julie's obstructionist behavior, Matthew had not had parenting time with L.S., the younger child, since entry of the December 20, 2017 order, and that Julie had failed to enroll in therapy and complete the initial intake. Based on Julie's failure to purge herself, the family court sentenced Julie to thirty days' incarceration, conditionally discharged for two years, so long as Julie complied with all court-ordered parenting time. Julie was warned that her failure to ensure L.S. appeared for her scheduled parenting with Matthew could

result in revocation of the conditional discharge and the imposition of the jail sentence of up to thirty days.

On February 26, 2018, the family court held a hearing on Matthew's motion seeking to revoke Julie's conditional discharge. Following the hearing, the family court entered a written order on February 27, 2018, finding that Julie admitted her noncompliance with the parenting time orders and that Matthew had not had parenting time with L.S. since the entry of the February 6, 2018 order. As a result, the family court sentenced Julie to two days' incarceration and ordered her to comply with its parenting time orders.

On April 4, 2018, Julie filed a motion to terminate GAL Cook. In addition to attacking GAL Cook's fees, Julie alleged that GAL Cook "has never done anything on the record except attack [Julie]." The family court denied Julie's motion, determined that GAL Cook's fees were reasonable, and ordered Julie to pay GAL Cook's fees, as well as the fees GAL Cook incurred in seeking payment from Julie.

Julie now appeals from the orders entered by the family court on December 20, 2017, February 6, 2018, February 27, 2018, March 8, 2018, and April 19, 2018.

## II. ANALYSIS

### A. *Contempt Orders*

"Contempt is the willful disobedience toward, or open disrespect for, the rules or orders of a court." *Getty v. Getty*, 581 S.W.3d 548, 568 (Ky. 2019) (quoting *Commonwealth v. Burge*, 947 S.W.2d 805, 808 (Ky. 1996)). "When a court exercises its contempt powers, it has nearly unlimited discretion." *Morris v. Morris*, 504 S.W.3d 710, 713 (Ky. App. 2016) (citing *Smith v. City of Loyall*, 702 S.W.2d 838, 839 (Ky. App. 1986)). Consequently, we will not disturb a court's decision regarding contempt absent an abuse of its discretion. *Cary v. Pulaski County Fiscal Court*, 420 S.W.3d 500, 520 (Ky. App. 2013). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000). The trial court's underlying findings of fact are reviewed for clear error. *Commonwealth, Cabinet for Health Family Servs. v. Ivy*, 353 S.W.3d 324, 332 (Ky. 2011).

The family court's December 20, 2017 order determined Julie was in contempt of court for failing to comply with the court's prior orders on timesharing. The family court's order is detailed as to why it believed Julie was in contempt of court. It provides, in relevant part:

14.  [Matthew] filed his motion to hold [Julie] in contempt on July 18, 2017 and this order is limited to parenting time violations that occurred prior to that date.

15.  From June 25, 2015 to July 18, 2017, [Matthew] alleges [Julie] has violated the June 25, 2015 parenting time order on at least eleven (11) separate [] occasions, not including many more dates in where [Matthew] alleges [Julie] was late to exchanges.

16.  [Matthew] believes [Julie] has willfully disregarded this court's parenting time order by consistently undermining his relationship with the children to the point that the children refuse to exercise parenting time with him.

17.  There is significant evidence in the record to support [Matthew's] assertion.  To begin with, it is clear from the history of this case that [Julie] wishes [Matthew's] relationship with the children to be extremely limited, if not eliminated altogether, since the September 2014 domestic violence incident.

18.  Specifically, [Julie] has objected to every motion [Matthew] has made to restore his previous parenting time with the children since the October 2014 domestic violence incident . . . .  [Julie] believes the children should have only day time visits with [Matthew] and that these visits should be supervised.

19.  [Julie] has also sought to suspend [Matthew's] parenting time with the children on at least two (2) occasions, through an EPO/DVO in September 2017 and through a motion in January 2017.  Both of the attempts were denied.

20.  [Matthew] also submitted copies of text message exchanges from [Julie] to [Matthew's] father, in which she requests modifications to the parenting schedule and then becomes upset when [Matthew] does not acquiesce

to her requests. [Julie] then accuses [Matthew] of not caring about the children's needs, wishes and best interests.

21. The text messages also show [Julie] consistently resists [Matthew's] attempts to schedule make-up time for missed visits and regularly responds to his suggested make-up times by stating they are not compatible with her schedule.

22. [Matthew] also submitted text message exchanges that occurred between [Julie] and the oldest child, which occurred while the children were at [Matthew's] home for their court ordered parenting time. During the exchange, the oldest child was upset that [Matthew's] parenting time extended longer than she believed it was supposed to.

23. At no time during the exchange did [Julie] attempt to deescalate the situation or remove the child from the middle of parenting time disagreements. Rather, [Julie] encouraged the behavior of the child, including telling her to email the custody evaluator. [Julie] also [] repeatedly told the child she would make sure the parenting time ended at the time [the child] wished and engaged the child in steps to make sure this occurred.

24. The above incidents support the findings in the custody evaluation, in which the child's previous therapist indicated [Julie] had a history of validating the child's fears and anxiety, thereby increasing it. The therapist recommended to [Julie] that she stop engaging in the behavior, although the communications between [Julie] and the child indicate [Julie] continues to amplify the child's fears and anxiety.

25. Finally, [Julie's] actions or non-actions in this case have regularly interfered with attempts by this court to repair the children's relationship with [Matthew] through therapeutic methods, which could have addressed, in a

healthy and safe manner, the underlying reasons they do not wish to have parenting time with [Matthew], rather than continuing to place the children in the middle of this litigation.

26. [Julie] acknowledged to the custody evaluator in this case that she has anxiety resulting from the children having overnight parenting time with [Matthew]. The children's previous therapist also noted that [Julie's] anxiety regarding parenting time became overwhelming.

27. Despite this acknowledgment, [Julie] has not consistently engaged in individual therapy to address these issues, even after the custody evaluator recommend she do so and the court made that recommendation an order of the court.

. . . .

29. The custody evaluation also supports [Matthew's] assertion that [Julie] has interfered in his relationship with the children and his ability to exercise his parenting time. The evaluator indicated this was either a result of deliberate actions by [Julie] or a result of [Julie's] transference of anxiety to the children as a result of her overly-enmeshed relationship with the children and her untreated anxiety.

30. As her defenses to contempt, [Julie] asserts that the children refuse to go to the visitation and she [] lacks the ability to persuade them or get them to follow her directives, despite efforts on her part to get them to comply with the parenting order. [Julie] alleges the root of the children's behavior is [Matthew's] ongoing abusive behavior towards the children and their resulting fear of him.

31. This defense is not unique to this motion, as [Julie] has regularly explained her actions in this case as being

-25-

the result of the children's wishes, statements or behavior[.]

32. For this motion, [Julie] submitted as evidence a transcript of the phone call between [Matthew] and the children from June 17, 2017, in which the children refuse to go to parenting time with [Matthew].

33. [Julie] recorded the conversation without the knowledge of [Matthew] or [Matthew's] father, who was present at [Julie's] house in the room with the children and [Julie]. The conversation took place on [Matthew's] father's phone.

34. The conversation between [Matthew] and the children took place in front of [Julie] and lasted over twenty (20) minutes and resulted in a transcript over sixty (60) pages long.

35. During the conversation, the children consistently stated [Matthew] was abusive and they were scared of him. The children steadfastly refused to go on parenting time with [Matthew] and stated this many times.

36. In further support of her defense, [Julie] also had the parties' children testify at the August 31, 2017 hearing. The testimony was conducted in camera and was recorded as part of the record in this case.

37. During the testimony, both children again made statements indicating that they refused to go to parenting time with [Matthew] because he is abusive and they are scared of him. These statements are consistent with the statements they made during the phone call [Julie] recorded.

38. The children missed school on August 31, 2017 to be called as witnesses for [Julie]. When it was clear that the court would have to schedule additional time for the conclusion of the hearing, the court and the parties

agreed the children would testify out of order so they would not have to come back to court for the conclusion of the hearing, which was set for a school day approximately one (1) week later.

39. Ultimately, the conclusion of the hearing did not [take] place until November 30, 2017, also a school day. Despite this, [Julie] again chose to keep the children out of school so they could testify on her behalf at the hearing.

40. The court declined to hear the children's testimony at the November 30, 2017, [hearing] since they had already testified as to the issues addressed in [Matthew's] contempt motion.

41. [Julie] then chose to have the children testify by avowal after the three (3) hour hearing concluded. The court was not present when the testimony was taken and it was not considered as part of this motion.

42. [Julie] further argues she is unable to persuade the children to go to the parenting time and is similarly unable to get them to follow her directive that they must go.

43. Although [Julie] claims in both the recorded phone call and her testimony that she made efforts to get the children to the parenting time exchange, this is not reflected in the transcript of the phone call.

44. [Julie] only appears on the transcript of the call on twelve (12) occasions, even though she was present in the room for almost the entire call and was the party that requested the call be placed on speakerphone. However, the court notes that pages 21 and 22 of the transcript are missing from the copy provided to the court by [Julie], so it [is] unclear if there are additional appearances by [Julie] on those pages.

45. Of these twelve (12) occasions, six (6) of them are [Julie] interacting with [Matthew's] father regarding issues not related to the parenting time compliance, such as directing him into the room, offering him a seat, a beverage and a snack, and indicating her understanding that [Matthew's] father had accidentally disconnected the call and was calling [Matthew] back.

46. At no point during the phone call does [Julie] tell the children they need to attend the parenting time. Instead, [Julie] informs [Matthew's] father of the steps she took to get them to comply prior to his arrival at her home. There is no audio or video recording of these attempts by [Julie], even though Julie regularly records the children when it comes to parenting time disputes with [Matthew].

47. At one point during the call, [Matthew] specifically requests [Julie] tell the children they need to go with [Matthew's] father. [Julie] chooses to not tell the children this. Instead, [Julie] deflects the request by stating she has already told them and again lists the various ways in which she allegedly tried to get the children to comply.

48. Despite [Julie's] claimed inability to control the children on the issue of parenting time with [Matthew], it is clear from the record that [Julie] can control the children when it comes to many other issues.

49. For example, in the transcript of the Father's Day call, [Julie] directs the oldest child to let the younger child speak and the older child immediately agrees. In a separate portion, the oldest child tells [Matthew] that [Julie] previously told her to go for the parenting time and she refused, but then acknowledges that she complies with [Julie] on requests such as cleaning her room.

50. [Matthew] also tendered documentation of text messages that occurred between [Julie] and the oldest child while the child was having parenting time with

[Matthew]. In those exchanges, [Julie] directs the child to take certain steps to terminate the parenting time and the child complies with those directives.

51. Finally, [Julie] claims [Matthew] is abusive to the children and they are scared of him, which is why she cannot get the children to comply with the schedule. These same claims were made by the children, both in the Father's Day phone call [Julie] recorded and in their testimony to the court.

52. The children have consistently made these claims since the entry of the June 25, 2015 visitation order, although there has been minimal evidence to support the claims of the children, other than their testimony.

53. Regarding the children's testimony on August 31, 2017, the court finds it to be unreliable, despite the sincerity with which the children hold the beliefs. The court believes these statements are the result of [Julie's] influence and coaching, whether it is an intentional act of [Julie] to damage the children's relationship with [Matthew] or an unintentional act that occurs as a result of [Julie's] currently untreated anxiety.

54. This ability of [Julie] to influence the children is evidenced by the transcript of the phone call [Julie] recorded on Father's Day 2017. In one of the twelve (12) times [Julie] appears on the transcript, [Julie] suggests the phone call between [Matthew] and the children be placed on speakerphone, suggesting to the children that it would make them feel more comfortable.

55. Later in the transcript, [Matthew's] father states he hears a bell ringing and the oldest child indicates that it is from her cell phone. The child directs to [Julie] to turn the phone off, but rather than complying, [Julie] questions whether the child wants her to turn it off, suggesting instead that the sound be turned down on the

device, at which point the child changes direction and tells [Julie] she can just turn the sound off.

56. It is unclear from the transcript and testimony if the oldest child's phone was the device on which [Julie] was recording the conversation, which would have explained why [Julie] did not want to turn the device off.

57. The court also believes the testimony of the children is unreliable based on the children's language and behavior during the testimony, which seemed above their age and maturity level and more reflective of language used by an adult. Further, the testimony was vague and inconsistent. When the court attempted to gain specifics, the older child became angry and the younger child became extremely emotional and began crying.

58. The above findings are consistent with the custody evaluation in this case, which indicates [Julie] engaged in acts of coaching or attempting to influence the oldest child's communication with the therapist during joint therapy sessions.

59. In contrast to the above, the majority of the evidence in this case supports [Matthew's] testimony that he has not engaged in any intentional acts of abuse against the children since the September 2014 domestic violence incident.

60. Following the 2014 domestic violence incident, [Matthew] began individual counseling with Matt Veroff in October 2014 to address anger and parenting issues. [Matthew] subsequently continued the therapy with Dr. James Shields. [Matthew] and the children have also participated in joint therapy sessions with Dr. Anne Hammon and Dr. Kathryn Berla.

61. The custody evaluation incorporated above addresses [Matthew's] steps to address his issues and indicates that

it has been successful, as evidenced by [Matthew's] behavior and the reports of therapy providers in this case.

62. The effectiveness of the therapy is also evidenced by the June 17, 2017 phone call recorded by [Julie] without [Matthew's] knowledge.

63. During this entire conversation, [Matthew] used healthy and appropriate parenting skills, including attempting to reason with the children and address their concerns, as well as offering safeguards and compromises to the children. [Matthew] was able to maintain a calm and rational demeanor throughout a challenging conversation.

64. The court can find no example in the transcript of [Matthew] acting abusive, aggressive, angry or inappropriate. Further, at no point did [Matthew] make disparaging comments about [Julie], even when he believed [Julie] was unable to hear him.

(R. at 892-902.)

Based on these factual findings, the family court concluded that Julie had not complied with the parenting schedule in this case and her failure was "a willful disregard of the court's order." (R. at 904.) In an act of leniency, the family court allowed Julie the opportunity to purge herself of all contempt by fully complying with the parenting time orders and enrolling herself in individual therapy to address her anxiety issues surrounding Matthew's timesharing. Julie's failure to comply resulted in subsequent orders, which culminated in an order requiring her to be incarcerated for two days.

In her appellate brief, Julie spends a considerable amount of time rehashing the facts and attacking the family court's credibility determinations as well as its order requiring L.S. to have timesharing with Matthew. She argues that "[h]ad the Court taken into consideration the factors in KRS 403.270(2)(b), (c) & (g) the girls' wishes, the domestic violence, the interrelationship between the girls and Matthew, had the Court considered the girls' doctor's and psychotherapists' records, and that Julie actually complied, there could have been no conclusion other than that the relationship between the girls and Matthew was unhealthy and should not have been forced upon L.S. at that time."

As a primary matter, the order granting Matthew timesharing with L.S. is not part of these appeals. Regardless of whether Julie believed the family court reached the correct result in ordering timesharing, Julie was bound by the family court's temporary timesharing order. It was not for Julie to pick and choose which orders she believed were worthy of her compliance and which ones were not. As a litigant under the family court's jurisdiction, Julie was bound to follow the family court's orders, even the ones she did not think were correctly decided. Simply put, disagreement with an order is not a valid defense to contempt.

Julie's arguments regarding the family court's credibility determinations are likewise not convincing. It is abundantly clear that the family court carefully considered the evidence before it as well as the testimony of the

-32-

parties and the expert witnesses. At the end of the day, the family court had to make credibility decisions. This is its responsibility. The family court determined that Julie improperly used her influence over the children such that they began refusing to go to timesharing with Matthew. Instead of discouraging this behavior and encouraging the children to have better relationships with Matthew, Julie encouraged the children's refusal further, often putting words in their mouths and manipulating their perceptions of Matthew's behavior and motives, thus thwarting Matthew's ability to exercise his timesharing with the children. The evidence amply supports the family court's conclusions. The record overwhelmingly convinces us that the family court exercised its discretion appropriately and made reasoned findings regarding the motives and actions of the individuals involved in this dispute.

Julie further asserts that the family court failed to consider that L.S. "was so traumatized" that it was impossible for Julie to make her go to timesharing with Matthew. "Whether civil or criminal, a party cannot be punished for contempt for her failure to perform an act which is impossible." *Crowder v. Rearden*, 296 S.W.3d 445, 450 (Ky. App. 2009). "The inability to comply must be shown clearly and categorically by the defendant, and the defendant must prove [s]he took all reasonable steps within her power to insure compliance with the court's order." *Id.* at 450-51. While Julie argued to the family court that she

lacked the ability to force the children to go to parenting time with Matthew, the family court rejected this argument. It detailed the reasons for its conclusion, including that Julie failed to proffer any credible evidence that she actually tried to persuade the children to go to timesharing, and it noted that Julie appeared able to control the children when she was inclined to do so. As noted by the family court, the evidence supported the conclusion that, on previous occasions, Julie assisted the children in evading their timesharing with Matthew and coached them on how and what to say to the court and therapists to help bolster her case against timesharing. The record certainly supports these conclusions.

Julie's argument that the family court abused its discretion when it failed to allow Julie to call the children to testify at the contempt hearing and refused to hear from the children's treating psychotherapists also lacks merit. As noted by the family court, its considered the children's previous testimony. The family court determined that testimony was not credible and lacked reliability because Julie appeared to have coached the children prior to their being interviewed by the court. Furthermore, the issue was whether Julie had violated the timesharing; it was not whether the previously ordered timesharing was in the children's best interests. Rather than trying to actually present proof in support of her failure to comply with the parenting time orders, Julie sought to "defend herself" by presenting expert proof from experts "that because of Matthew's abuse,

it was harmful for L.S. to be forced to go with Matthew at that time." This was just another attempt at undermining the family court's previous determination that timesharing with Matthew was in L.S.'s best interest. It was Julie's obligation to comply with the court's directive, notwithstanding the fact that she and her experts disagreed with the family court's judgment. Julie had an opportunity to present evidence prior to entry of the temporary timesharing order, and she did so. Her evidence did not carry the day, and her reliance on additional evidence to support her losing argument is not a defense to contempt. In short, we cannot discern any abuse of discretion in the family court's decision to limit the testimony and evidence.

In sum, we agree entirely with the family court's decision to hold Julie in contempt of court for her failure to abide by the timesharing agreements. Far from abusing its discretion, the family court was perhaps overly generous in providing Julie with opportunities to purge herself and avoid jail time. Despite the family court's generosity, Julie continued to operate according to her own set of rules, flouting the family court's orders and attempting to reargue issues that had long since been decided against her, such as whether Matthew domestically abused the children in 2014 and whether he intentionally shut L.S.'s hand in the car door in 2017. Julie's dogged insistence at avoiding timesharing has likely caused these children untold amounts of emotional and psychological damage. At a certain

point, the family court could no longer sanction Julie's blatant refusal to follow directives which therapists, the custody evaluator, and most importantly the family court determined were in the best interests of these children. As a last resort, the family court sentenced Julie to serve a mere two days in jail. Again, the family court is to be commended for its judicial restraint. Julie was given several opportunities to right her course and begin complying with the court's timesharing orders, and she was warned that her failure to do so could result in significant jail time. The family court ultimately sentenced Julie to the least amount of time it determined would ensure her future compliance with its directives.

The record contains sufficient proof to refute any claim of abuse of discretion by the family court in finding Julie in contempt for her failure to abide by the timesharing orders, in sentencing her to thirty (30) days conditionally discharged, or in revoking the conditional discharge and sentencing Julie to two days in jail. In the future, Julie would do well to abide by court orders, even ones she does not believe were correctly decided. There is an appellate process to challenge orders that one believes are erroneous, and Julie is free to utilize that process. What Julie cannot be allowed to do, however, is pick and choose which orders she believes are worthy of her compliance. Julie is not above the law.

We now turn to the family court's order finding Julie in contempt for her failure to pay her half of GAL Cook's fees. In its December 20, 2017 order,

the family court summarized the procedural history related to the GAL fees in this

case as follows:

> 65. Nicole Cook was appointed [GAL] for the children on November 17, 2016, replacing a previous GAL in this case.
>
> 66. By order of October 19, 2015, the court required the parties to divide equally any GAL fees going forward. . . .
>
> 67. Since November 17, 2016, [Julie] has made one payment to the [GAL] in the amount of $600.00. This payment was made on December 9, 2016.
>
> 68. As of August 31, 2017, [Julie] owes the [GAL] $3,039.34 in past due fees.
>
> 69. The [GAL] has provided monthly statements to [Julie], which [Julie] acknowledges receiving.
>
> 70. [Julie] testified she has refused to pay the fees because she does not agree with the [GAL's] representation of the children.
>
> 71. [Julie] also alleges inability to pay due to her unemployment. [Julie] was previously employed as a guidance counselor at Walden School, where the children are enrolled in school. The school has also been the site of several parenting time issues in this case.
>
> 72. [Julie] took a voluntary leave of absence from the school in September 2016. The school chose to terminate [Julie's] position as of the end of the 2016-2017 school year.
>
> 73. [Julie] has an undergraduate degree in psychology and two master's degrees in clinical and educational psychology. [Julie] testified that she has been looking

for employment but has been unsuccessful.  [Julie] does not have any disabilities that prevent her from working.

(R. at 902-03.)

Based on these facts, the family court concluded that Julie was in contempt of court for her failure to follow the family court's prior order directing her to pay half of the GAL's fees.  Once again, however, the family court exercised leniency by allowing Julie approximately three months to purge herself of the contempt by paying the past due amounts.  Julie was warned that her failure to do so could result in additional sanctions, including potential incarceration.  Julie did not pay the fees as ordered and was held in contempt of court.  She was also ordered to pay for GAL Cook's costs in seeking payment.

Once again, Julie raises issues long since decided, such as whether the family court appropriately ordered her to pay half of the GAL fees in the first instance.  That order was entered in 2015.  Julie did not contest the order at that time.  Likewise, even though Julie was repeatedly billed by the GAL, she did not voice any prior objection to the GAL's hourly rate.  She also did not voice any opposition to the continued use of a GAL until GAL Cook began advocating in favor of the children having more time with Matthew and opposing Julie's choice to speak with the media and engage in other public discourse about the case.

The evidence was clear that Julie was ordered to pay half of the GAL fees and that she failed to do so, making her in violation of the family court's 2015

order.  As a result, the family court properly determined that Julie was in contempt of court.  Julie asserted that she was unable to pay the GAL fees; however, the family court expressly considered Julie's educational and professional background and determined that Julie had the ability to work should she so desire.  This is tantamount to a conclusion that Julie should have the ability to pay the fees over a three-month period.  During that three months, Julie failed to make any attempt at paying the fees.  We find no abuse of discretion with respect to the contempt orders related to GAL Cook.  We also do not agree with Julie that issues relating to GAL Cook's hourly rate or her actions in this case were relevant to the contempt issue.  It smacks of disingenuity for Julie to have brought those issues only after GAL Cook moved the family court to hold her in contempt.

### B.  Video Recording of Children's Testimony

Julie's last argument concerns the family court's ruling with respect to the video recordings made of the children's testimony.  Julie and her attorneys sought to obtain copies of the recordings.  Citing the sensitive nature of the testimony and Julie's prior propensity to make issues in the case public, the family court denied her motion.  However, the family court did not bar either Julie or her counsel from assessing and viewing the testimony.  To the contrary, the family court made clear that the testimony could be viewed at the courthouse by Julie and her counsel whenever they so desired.

In *Couch v. Couch*, 146 S.W.3d 923 (Ky. 2004), the Kentucky Supreme Court held as follows:

> We are cognizant of the fact that in many instances it may be helpful for the trial court to privately interview the child whose welfare is so vitally affected by the trial court's decision in an attempt to protect him or her from the pain of openly choosing sides. Nevertheless, it is the parties' constitutional right to hear all of the evidence offered in the case. In an action concerning custody or visitation, any procedure whereby the trial court prohibits disclosure of the transcript of a child's interview to the parties raises significant due process questions. The parties are entitled to know what evidence is used or relied upon by the trial court, and have the right generally to present rebutting evidence or to cross-examine, unless such right is waived. If a trial court accepts and acts upon statements made by the child during the *in camera* interview, it is manifestly unfair not to record and disclose the contents of the interview in order to provide an opportunity for rebuttal. *See generally* S. Bernstein, Annotation, *Propriety of Court Conducting Private Interview With Child in Determining Custody*, 99 A.L.R.2d 954 (1965).
>
> In striking the appropriate balance between the interests of children and the procedural rights of parents, we hold that while it is certainly within the discretion of the trial court to conduct an *in camera* interview in the absence of the parties and counsel, a record of such interview must be made so that the parties are afforded the subsequent opportunity to determine and contradict the accuracy of statements and facts given during the interview.

*Id.* at 925-26.

The family court did not run afoul of *Couch* and its actions do not violate Julie's due process rights. As held in *Couch*, the parent must have access to the record so that she can be made aware of what was said and given the opportunity to determine and contradict the accuracy of the statements. Julie and her counsel have not been denied access to the interviews. The record attests to this fact, as they have extensively discussed what occurred in these interviews. Those videos can be viewed by the parties at any time in the courthouse's viewing room. Denying a party the right to leave the courthouse with a copy of the record is an entirely different matter than not making a record or not allowing a party to view the record.

Given Julie's prior actions, the GAL's opposition predicated on the children's best interests, and the sensitive nature of the testimony by two minor children, we do not believe the trial court abused its discretion by placing some modest restrictions on regarding how Julie could view and access these videos. The family court appropriately balanced Julie's right to due process rights with the privacy rights of the minor children. Its order preserves Julie's due process rights while at the same time minimizing the risks to her children. There was no abuse of discretion in denying Julie's request for a copy of the videos when she was permitted reasonable access to view those videos at the courthouse.

## III. CONCLUSION

For the reasons set forth above, the orders of the Jefferson Family Court are affirmed.

ALL CONCUR.

BRIEF FOR APPELLANT:

Thomas E. Clay
Beth Lewis Maze
Louisville, Kentucky

BRIEF FOR APPELLEE MATTHEW SALLEE:

John H. Helmers, Jr.
Louisville, Kentucky