NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0374-I

ASHLEY CAUDILL; BRITTANY EVANS;                                    MOVANTS
CHASE FOSSITT; CHERRY WILSON;
DARWIN SIMPSON; DJUANA ELLIS;
JILL HERPY; AND TIMOTHY POE

V.
                        ON REVIEW FROM COURT OF APPEALS
                        NOS. 2025-CA-0792 & 2025-CA-0802
                        CAMPBELL CIRCUIT COURT
                        NOS. 24-CI-00736, 24-CI-00755 & 24-CI-01004

SANITATION DISTRICT NO. 1 OF                                    RESPONDENTS
NORTHERN KENTUCKY ("SD1"); AND
BRAY CONSTRUCTION SERVICES,
INC.

## OPINION AND ORDER
## DENYING MOTION FOR INTERLOCUTORY RELIEF
## AND REMANDING

Movants have filed a motion pursuant to RAP[1] 20(F) seeking to vacate a Court of Appeals order granting interlocutory relief to Respondents pursuant to RAP 20(B). The Court of Appeals' order vacated a circuit court order which granted temporary injunctive relief to Movants. After review, we deny the Movants' motion and remand to Campbell Circuit Court for further proceedings.

---

[1] Kentucky Rules of Appellate Procedure.

## I.  BACKGROUND

The eight Movants in this matter own condominiums in the Woodland Hills Condominium Complex in Campbell County.  Respondent Sanitation District No. 1 of Northern Kentucky (SD1) hired Respondent Bray Construction Services, Inc. (Bray) to perform work on SD1's construction project at the Woodland Hills complex.  Bray was hired to perform excavation and trenching work for the installation of a sewer pipe.  It is alleged that during the project, the Respondents removed lateral and subjacent support from the Woodland Hills property, causing damage to both the complex itself and the Movants individually.  Movants were advised that the property was at risk of landslide due to the damage, and it was recommended that they evacuate by the complex's homeowner's association (HOA).

Movants filed suit in Campbell County Circuit Court against Respondents alleging breach of contract; strict liability for failure to provide lateral and subjacent support; inverse condemnation; negligence, gross negligence, and professional negligence; and trespass.  On August 14, 2024, the Movants filed a motion for injunctive relief pursuant to CR[2] 65.01.  In the motion, the Movants asserted that they were suffering immediate and irreparable injury.  Specifically, that "[e]very one of them has lost their home"; "[m]any of them are suffering medical conditions as a result of the anxiety brought on by the requested evacuation of their homes"; "[t]hey are stuck

_____

[2] Kentucky Rules of Civil Procedure.

paying mortgages on their units in which they cannot reside"; and that "[t]hey continue to incur [HOA] fees, storage fees, housing costs, additional utility costs, and more." The Movants' motion for injunctive relief requested that

the Court issue an order, requiring the Defendant[3] to do the following specific acts:

a) To provide alternative housing, immediately, to each resident of Building 30. Said housing should be of comparable quality, similar number of bedrooms, similar number of bathrooms, as Plaintiffs' current condominiums.

b) To provide moving and storage services to each Plaintiff at their specific request to assist every Plaintiff in moving and storing all of their furniture and personal belongings.

c) To provide assistance in mortgage payments, debt service, HOA fees, and any other and all other monetary damages that the Plaintiffs continue to incur.

d) Any other and all acts as determined by the Court, following a hearing on this motion, to minimize the ongoing damage to these Plaintiffs and to restore them to their status quo.

Following three hearings and briefing on the Movants' motion, the circuit court granted the temporary injunction. Citing *Price v. Paintsville Tourism Comm'n*, 261 S.W.3d 482, 484 (Ky. 2014), the court noted that CR 65.04 has been construed to require it to deny injunctive release unless it found (1) that there is a substantial possibility that the movants will ultimately prevail on the merits of an underlying claim; (2) that the movants' remedy will be irreparably impaired absent the extraordinary relief; and (3) that an injunction will not be inequitable, i.e., will not unduly harm other parties or disserve the public.

---

[3] The only motion provided in the record before us was filed solely against SD1. We presume a similar motion was also filed against Bray.

3

The court found that there was a substantial possibility that the Movants would ultimately prevail on their breach of contract claim against SD1 and their negligence claim against Bray. It then found "that there will be irreparable harm suffered by the Plaintiffs absent the relief requested[.]" It rejected the Respondents' argument that "the Plaintiffs will not suffer irreparable harm on the basis that the relief sought is purely compensatory." It reasoned: "Although Plaintiffs seek relief in the form of financial payment, the harm they suffer absent such relief is likely incalculable." The court concluded that *Henry v. Koch*, 80 Ky. 391 (1882) held "that the destruction of one's property amounts to irreparable harm, that that monetary damages may be awarded to put a plaintiff in a place they were prior to the destruction of property." It then found:

> In this case Plaintiffs were sent a letter recommending they evacuate The Building due to a landslide. That landslide resulted in soil removal and structural damage to their homes making it unsafe to live in. Despite that fact, [t]wo of the eight movants still reside in their home due to the inability to afford relocation. One of the movants testified as to the severe disparate living conditions she is experiencing due to her relocation. Seven of the eight movants state that they are unable to afford to pay for both their mortgage and associated fees at Woodland Hills and pay for alternative housing at the same time, with the eighth movant stating they are struggling to afford groceries on top of the two different housing payments. All Plaintiffs face an impossible choice. Stay and face possible death, or disease; leave and face possible foreclosure, lack of sufficient food or housing. Regardless, all Plaintiffs face the loss and enjoyment of their homes. Such injuries are irreparable, and although they can be compensated through economic means to prevent them from occurring, they cannot be properly remedied after the fact through economic means should they occur, rendering such final judgment meaningless. Therefore, the Court agrees with Plaintiffs that the injuries alleged are irreparable harm.

4

Finally, the circuit court found that granting the injunction would not be inequitable. Specifically: that the $2,000 per month each Movant was seeking until their homes became habitable again was "not inequitably harmful to the Defendants, as SD1's disclosed 2024 operating budget was $127,927,500, and Bray was paid at least $3,721,378.68 for the construction services related to the project which allegedly caused the harm suffered in this case."

The court ordered SD1 and Bray to each pay $1,000 per month to each of the eight Movants until further orders from the court. This included backpay from the date the motion for an injunction was filed. The circuit court did not set an appellate bond pursuant to CR 65.05.

The Respondents thereafter filed an interlocutory appeal to the Court of Appeals under RAP 20(B). The Court of Appeals granted interlocutory relief to the Respondents and dissolved the circuit court's temporary injunction. It held that "the trial court abused its discretion by awarding monetary relief by way of a temporary injunction." It reasoned that injunctive relief is only available when monetary damages will be insufficient to compensate for an injury and that it will generally not be granted "when the remedy at law is sufficient to furnish the injured party full relief." *Price*, 261 S.W.3d at 484 (quoting *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642, 645 (Ky. 1992)). It further noted that Kentucky appellate courts have consistently held that "delay incident to litigation and appeal by litigants who may be financially distressed cannot be considered as unjust, does not constitute irreparable injury, and is

5

not a miscarriage of justice." *Ison v. Bradley*, 333 S.W.2d 784, 786 (Ky. 1960); *Indep. Order of Foresters v. Chauvin*, 175 S.W.3d 610, 616 (Ky. 2005).

The Court of Appeals further concluded that "requiring a party to pay damages in the absence of a final adjudication of a judgment creates serious due process concerns." It relied on *PremierTox 2.0 v. Miniard*, in which this Court held that a trial court had no authority "to require a party to pay a demanded judgment into court in advance of an adjudication that he owes it." 407 S.W.3d 542, 545 (Ky. 2013).

Finally, it held that the circuit court's failure to order the parties to post an appellate bond as required by CR 65.05 was "alone fatal to enforcement of the trial court's temporary injunction."

The Movants thereafter filed a motion to vacate the Court of Appeals' order pursuant to RAP 20(F). That motion is now before this Court for review.

## II.    ANALYSIS

The Court of Appeals granted the Respondent's motion pursuant to RAP 20(B), which provides that "[w]hen a circuit court by interlocutory order has granted. . . a temporary injunction, a party adversely affected may. . . move the Court of Appeals for relief from such order." The Movants' motion now before this Court was filed under RAP 20(F)(1), which states that "Any party adversely affected by an order of the Court of Appeals in a proceeding under [section] (B). . . of this rule may. . . move the Supreme Court to vacate or modify it." It further provides that "[s]uch a motion will be entertained only for extraordinary cause shown in the motion."

6

Thus, the Movants must demonstrate extraordinary cause to be entitled to the relief they seek. CR 65.09(1)[4] was the predecessor to the more recently enacted RAP 20(F)(1). Our case law discussing CR 65.09(1) recognizes that "the movant faces an 'enormous burden'" in demonstrating extraordinary cause. *Chesley v. Abbott*, 503 S.W.3d 148, 152 (Ky. 2016) (citing *Courier–Journal, Inc. v. Lawson*, 307 S.W.3d 617, 620 (Ky. 2010) (quoting *Kindred Hosps. Ltd. P'ship v. Lutrell*, 190 S.W.3d 916, 919 (Ky. 2006)). However, it further acknowledges that "an abuse of discretion by the courts below can constitute extraordinary cause." *Chesley*, 503 S.W.3d at 152 (citing *Nat'l Collegiate Athletic Ass'n v. Lasege*, 53 S.W.3d 77, 84 (Ky. 2001)). A court abuses its discretion when it rules in a manner that is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

As previously noted, when addressing a motion for a temporary injunction, a circuit court must: (1) "determine whether plaintiff has complied with CR 65.04 by showing irreparable injury. This is a mandatory prerequisite to the issuance of any injunction."; (2) "the trial court should weigh the various equities involved[,]" including, but not limited to "possible detriment to the

---

[4] CR 65.09 was repealed effective January 1, 2023. Its relevant language was verbatim to that of RAP 20(F)(1). *See* CR 65.09(1) (eff. March 1, 2020, to December 31, 2022) ("Any party adversely affected by an order of the Court of Appeals. . . may. . . move the Supreme Court to vacate or modify it. The decision whether to review such order shall be discretionary with the Supreme Court. Such a motion will be entertained only for extraordinary cause shown in the motion.")

public interest, harm to the defendant, and whether the injunction will merely preserve the status quo."; and (3) the trial court should evaluate "whether a substantial question has been presented." *Maupin v. Stansbury*, 575 S.W.2d 695, 699 (Ky. App. 1978). "If the party requesting relief has shown a probability of irreparable injury, presented a substantial question as to the merits, and the equities are in favor of issuance, the temporary injunction should be awarded." *Id.* A circuit court's decision to grant a temporary injunction will not be set aside unless the ruling constituted an abuse of discretion. *Id.*

The Movants first fault the Court of Appeals for solely addressing the circuit court's finding of irreparable harm and not the other two prongs of the test for granting a temporary injunction. But, as the finding of irreparable harm "is a mandatory prerequisite to the issuance of any injunction[,]" *id.*, there would be no reason to address the other two prongs once it concluded that irreparable harm was not shown. The Movants contend that the circuit court did not err by concluding that the "ongoing loss and/or pending loss of their homes" constituted irreparable harm.

While this Court is certainly sympathetic to the situation the Movants are in, our jurisprudence is clear that harm will be deemed irreparable only "if 'there exists no certain pecuniary standard for the measurement of the damages.'" *Brewer*, 828 S.W.2d at 645 (quoting *United Carbon Co. v. Ramsey*, 350 S.W.2d 454 (Ky. 1961); 42 Am.Jur.2d Injunctions § 49)). Consequently, "[i]njunctions, generally, will not be granted. . . when the remedy at law is

8

sufficient to furnish the injured party full relief to which he is entitled in the circumstances[,]" *Brewer*, 828 S.W.2d at 645, and "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Norsworthy v. Kentucky Bd. of Med. Licensure*, 330 S.W.3d 58, 62 (Ky. 2009) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

At bottom, the Movants seek redress for damage to their homes allegedly caused by SD1 and Bray. If they succeed in their suit against those parties, they will have the ability to recoup their financial losses from the damage to their homes and the financial strain placed upon them due to the expenses associated with temporarily relocating. Thus, a pecuniary standard exists to measure their damages, rendering the temporary interlocutory relief they requested and received inappropriate. We accordingly conclude the circuit court abused its discretion by granting the Movants' motion for a temporary injunction.

*Koch*, relied upon by both the circuit court and Movants, does not change this outcome, as it did not involve injunctive relief in the form of ordering a defendant to pay a plaintiff money prior to the adjudication of the claim on the merits. In *Koch*, the parties, Henry and Koch, had separately obtained two adjacent properties that were divided by a partition wall. 80 Ky. at 392-93. The partition wall supported Henry's home but sat entirely on Koch's plot. *Id.* at 393. Koch decided to remodel his property and, in doing so, he

9

took the roof from [Henry's] house to the extent that it covered the strip of ground between the wall and the real division line; cut loose every other rafter supporting the roof; took up the floor of the second story of [Henry's] room over the strip; and proceeded to make various openings in the wall for the purpose of making his improvements[.]

*Id.* at 393-94. This left "the inside of [Henry's] house entirely exposed." *Id.* at 394. Henry obtained "an injunction *to prevent the injury*" shortly after Koch began this work; Henry was not awarded money damages pursuant to the injunction but rather the injunction ordered Koch to cease dismantling her home. *Id.* (emphasis added). A chancellor later "dissolved the injunction upon the ground that. . . no irreparable injury could result to [Henry] from the conduct of [Koch.]" *Id.* The chancellor reasoned Henry "could build a wall on her own lot to support the roof, and if wronged by the appellee, her remedy was at law and not in equity." *Id.*

Kentucky's then-highest court reversed the chancellor and held that "the relief sought should have been granted *in the manner designated.*" *Id.* at 398 (emphasis added). It reasoned:

It is unnecessary to inquire whether [Henry] has an adequate remedy at law, and to determine that, because she could maintain an action of trespass or recover damages, she must look on and see her house destroyed, would, in effect, invite [Koch] to finish his undertaking. When the injury is irreparable, or permanent ruin to property will ensue from the wrongful act, a court of equity will interfere by injunction to prevent the injury.

*Id.* at 397. So, the purpose of the injunction granted in *Koch* was to prevent Koch from inflicting *further* damage to Henry's property in pursuit of remodeling his own property. The injunction in that case did not order Koch to

10

reimburse Henry for the damage he had already inflicted or to aid with her living expenses. The case therefore does not support the Movants' contention that they may be awarded monetary assistance from the Respondents while the litigation below plays out.

Two of the other cases the Movants rely upon, *Dinter v. Miremami*, 627 F. Supp. 3d 726 (E.D. Ky. 2022) and *Ali v. Louisville Metro Housing Auth.*, 3:22-CV-463-CHB, 2023 WL 4564779 (W.D. Ky. July 17, 2023) are also unavailing because both involved motions for injunctive relief that sought to prevent the respective defendants *from evicting* the plaintiffs pending the outcome of an adjudication on the merits. *Smith v. State Farm Fire and Cas. Co.*, 737 F. Supp. 2d 702 (E.D. Mich. 2010), also relied upon by the Movants, is likewise inapplicable here. To first state the obvious, it is an opinion issued by a federal district court applying Michigan law.

But, even so, *Smith* involved plaintiffs who suffered a fire at their home which left them "homeless and without useable personal property." *Id.* at 705. The plaintiff's insurer, State Farm, initially "acknowledged the loss as covered under the policy and began making payments to Plaintiffs for Alternative Living Expenses ("ALE") and approximately $29,000 to repair the residence." *Id.* The plaintiff's ALE expenses included alternate housing "at a rental cost of $3,000 per month, which State Farm paid directly to Plaintiffs' landlord." *Id.* Eventually, after State Farm became dissatisfied with the rate at which the appraisal process was proceeding, it stopped making payments to the plaintiffs for storage fees and ALE expenses. *Id.* at 706. It also denied any further

liability for the claim. *Id.* In the plaintiff's motion for a temporary injunction, which the district court ultimately granted, they sought "to preserve the state of affairs that existed prior to State Farm's termination of [ALE] benefits and withdrawal from appraisal." *Id.* at 708.

Thus, unlike in the case before us, *Smith* involved a temporary injunction motion to preserve the status quo by requiring the defendant to continue making payments it was already voluntarily making pursuant to a previously existing insurance contract. In addition, it is notable that while the factors that must be considered to grant a temporary injunction under Michigan law are substantially similar to Kentucky's factors, Michigan does not consider any one factor to be a necessary "prerequisite." *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (applying Michigan law and noting "[t]hese four considerations are 'factors to be balanced, not prerequisites that must be met.'"); *compare Maupin*, 575 S.W.2d at 699 ("[demonstrating irreparable harm] is a mandatory prerequisite to the issuance of any injunction.").

We also share the Court of Appeals' concerns regarding the due process implications of ordering the Respondents to pay any amount of money to the Movants prior to a conclusive legal determination of wrongdoing by the Respondents. The Movants' attempt to distinguish the case relied upon by the Court of Appeals, *PremierTox*, is unconvincing. PremierTox provided laboratory services, such as uranalysis testing, for medical service providers. 407 S.W.3d at 544. Through contractual arrangements PremierTox agreed to provide

12

laboratory services for Kentucky Spirit's Medicaid recipients. *Id.* Kentucky Spirit agreed to pay PremierTox via the same contractual arrangements. *Id.* PremierTox filed suit against Kentucky Spirit alleging that Kentucky Spirit owed it over $1.8 million dollars for services it provided to Medicaid recipients, for which Kentucky Spirit had been paid by the Commonwealth of Kentucky. *Id.*

Concerned that Kentucky Spirit would leave the state and abandon its obligations, PremierTox filed a motion for an order to have Kentucky Spirit place the $1.8 million PremierTox alleged it was owed into an escrow account controlled by the circuit court pending adjudication of the merits. *Id.* at 545. The circuit court granted that motion, and Kentucky Spirit filed a petition for a writ of prohibition in the Court of Appeals to prevent the circuit court from enforcing the order. *Id.* The Court of Appeals granted the writ and held, in part, that "a circuit court has no authority 'to require a party to pay a demanded judgment into court in advance of an adjudication that he owes it.'" *Id.*

This Court affirmed the Court of Appeals' issuance of the writ. *Id.* at 549. It noted that the class of writ at issue required a showing that the circuit court was "acting or [was] about to act erroneously, *and* the petitioning party [had] no adequate remedy on appeal or otherwise and would suffer a great injustice or irreparable injury if the writ was not issued." *Id.* at 546. Pertinent to the matter before us, the *PremierTox* Court held concerning irreparable injury that the Court of Appeals' reasoning that "a very gross injustice may be

13

done by ordering money to be escrowed without adjudication of liability, as the defendant may be put to great inconvenience just to later be told that his view of the case was correct" was sound. *Id.* at 549 (internal quotation marks omitted). And, therefore, Kentucky Spirit had satisfied the "irreparable injury" prong of the analysis. *Id.*

The Movants contend that *PremierTox* is inapplicable because it involved a writ of prohibition rather than a temporary injunction. We certainly acknowledge that a writ of prohibition and a temporary injunction are different avenues for relief. However, both are considered extraordinary remedies and, if proceeding under the class of writ requiring that a lower court is acting within its jurisdiction but nevertheless acting erroneously, both necessitate a showing of irreparable harm. And, at the very least, the concern of the *PremierTox* Court about the equities involved in forcing a party to pay what amounts to monetary damages prior to any adjudication of that party's liability is applicable here.

Finally, the Movants attempt to justify the circuit court's failure to set an appellate bond pursuant to CR 65.05 by asserting that the "parties have agreed no bond would be required until after the Court of Appeals filed its ruling." That is insufficient. CR 65.05(1) states in relevant part

> No. . . temporary injunction shall be granted except upon the giving of a bond by the applicant, with surety, in such sum as the court or the officer to whom application is made deems proper, for the payment of such costs and damages as may be incurred or suffered by any person who is found to have been wrongfully . . . enjoined.

14

Nothing in the rule permits the parties to waive CR 65.05's requirement upon agreement, nor have the Movants presented this Court with any case law permitting the waiver of an injunction bond by agreement of the parties. This too was an abuse of the circuit court's discretion.

## III.  ORDER

The Movants' motion for relief under RAP 20(F)(1) is hereby DENIED. The Campbell Circuit Court's June 5, 2025, order granting the Movants a temporary injunction is hereby VACATED, and this matter shall be remanded to Campbell Circuit Court for further proceedings.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. Lambert, C.J.; Bisig, Conley, and Nickell, JJ., concur. Keller, J., dissents by separate opinion which Thompson, J., joins. Goodwine, J., not sitting.

KELLER, J., DISSENTING: After holding three extensive hearings on the matter, the circuit court issued a lengthy and detailed Opinion and Order, which included a temporary injunction granting status quo relief to Movants, homeowners whose homes had become uninhabitable through no action of their own. I cannot find an abuse of discretion in the circuit court's issuance of a temporary injunction, which purpose was to prevent Movants from enduring homelessness, the loss of their homes, desecration of their credit scores, mental anguish and potential physical illness or death. Ultimately, because the majority opinion overlooks the irreparable harm in the foregoing, I must respectfully dissent.

15

**BACKGROUND/FACTS**

In support of its Injunction Order, the circuit court made detailed, specific findings of facts and conclusions of law which are reflected in the factual background detailed below. "A trial court's factual findings made in the absence of a jury will not be set aside unless they are clearly erroneous." *Sebastian-Voor Props., LLC v. Lexington-Fayette Urb. Cnty. Gov't,* 265 S.W.3d 190, 195 (Ky. 2008). Factual findings are not clearly erroneous if they are supported by substantial evidence which constitutes evidence having the fitness to induce a belief in the minds of reasonable men. *Moore v. Asente,* 110 S.W.3d 336, 354 (Ky. 2003).

Prior to an excavation and trenching project undertaken by the Respondents, the Movants were all residing in their structurally sound, sanitary, and habitable homes in Woodland Hills Condominiums. In May 2024, as part of a contract with Respondent Sanitation District No. 1 ("SD1") to complete a sewer expansion project, Respondent Bray Construction ("Bray") began excavation behind the Movants' condominiums. Despite Respondents having notice of slope stability issues in that area, SD1 nevertheless failed to fulfill its contractual agreement to Woodland Hills of Southgate Council of Co-Owners, Inc. ("HOA") to employ a temporary shoring system as recommended by a Kentucky-licensed Professional Engineer or provide full-time construction monitoring at Woodland Hills. The hillside near the Movants' homes became unstable, and the homes incurred significant structural damage.

16

Movant Brittany Evans ("Evans) noticed two large pieces of machinery branded "Bray Construction" digging and piling dirt behind her condominium. Later that same day, she noticed structural damage to her condominium for the first time. This damage included an uneven floor, a crack in the floor large enough to put one's hand in the hole, a crack in the foundation, tiles falling from the bathroom wall, dirt coming out of baseboards, and a separation of the baseboard so large that she could reach her hand into her neighbor's condominium. The next month, she received a letter, sent at the HOA's behest, advising her that

> SD1's geotechnical engineers have retrieved data from the inclinometers installed in the hillside . . . which indicate that the slope is continuing to move and is undergoing an active landslide. Consequently, SD1's structural engineer . . . is strongly recommending that the occupants evacuate . . . as soon as possible as a precautionary measure.

All other residents received this same letter, along with a proactive offer of $3,650 in relocation assistance from SD1.[5] Evans heeded SD1's geotechnical engineers' recommendation to evacuate and moved her family to a less desirable neighborhood at a cost of $1,750 per month. Although her condominium is uninhabitable, she has remained responsible for HOA fees and utilities at her Woodland Hills home. She had no significant savings. She cannot afford the expenses of both her current residence and her Woodland Hills home, and her family struggles daily to pay bills and buy groceries.

---

[5] SD1 offered this relocation support without admitting liability or fault or requiring any release of claims. A majority of the residents accepted this assistance, but some declined or failed to respond.

17

Evans has had to get another job to pay for these expenses, depriving her of time with her son. She was forced to surrender her dog, as she could not afford an apartment that allows dogs. Moving has aggravated Evans' severe anxiety and depression. The condominium has not been repaired, and damage to the condominium has caused plumbing issues which has caused mold to grow in her neighbor's condominium. Evans lives on the bottom floor and will be unable to reside in her condominium while the floors are being repaired.

Like Evans, Movant Djuana Ellis ("Ellis") relocated after receiving the letter recommending evacuation. Ellis had paid off her condominium but is now unemployed. She cannot afford a rent payment, so her options for alternate housing are limited. Ellis evacuated from her condominium into a basement at another residence. She boils water that she gets from a hose in the side yard on a hot plate and uses a McDonald's cup to then scoop out the water to bathe. She cooks food in a crock pot or air fryer, as she only has two electric outlets available. The basement floods and struggles to retain heat, and the electricity is susceptible to going out in high winds. The sewer water often backs up, causing the toilet to back up. Unfortunately, Ellis has suffered stomach and gastrointestinal issues, headaches, anxiety, and depression from this relocation. Since evacuation, plumbing issues inside her condominium have caused water to back up and mold to grow. She lives on the bottom floor and will be unable to reside in her condominium while the foundation is being repaired, which will require removal of the concrete floors from her immediate neighbors.

18

We now move to Movant Darwin Simpson ("Simpson"). After he noticed large Bray equipment onsite, he began to note damage to his condominium including movement in the doors, his balcony pulling away from the building, and a vertical crack in the foundation through the brick. Unlike Evans and Ellis, Simpson, at the time of the hearings in this matter, was still living at Woodland Hills despite having received the evacuation letter. However, the receipt of the evacuation letter did prompt his tenant, who was living in his second bedroom and helping Simpson financially, to leave, imposing a financial hardship on Simpson. Simpson has fallen behind on his mortgage payments and is threatened with the possibility of foreclosure. Even if he sold his condominium, the damage to the condominium would prevent him from selling it at market price to pay off his mortgage. Rental units comparable to his condominium cost around $2,000 per month. Because of the situation, Simpson has been experiencing anxiety. He will be unable to live in his condominium while the building is being shored up and repaired, as the concrete floors will be removed and replaced during that time.

Additionally, Movant Chery Wilson ("Wilson") first noticed structural issues after construction began, including damage in a storeroom, a crack in the floor, bowing in the ceiling, waste backing up from a pipe filled with rock and debris, a sewage smell, lights that could not be turned on, a thirty-foot crack that runs behind the entirety of the building, and wet floors. Despite the damage and letter recommending evacuation, Wilson remained. At the time, she was living off social security income and could not afford to move. She now

19

lives in constant fear for her safety. The plumbing issues in the building have caused mold to grow in her neighbor's condominium. It will be unsafe for her to live in her condo on the bottom floor as they repair the foundation, which will require the removal of the concrete floors from her immediate neighbors' dwellings.

Movant Chase Fossitt ("Fossitt") evacuated his family to what was supposed to be a temporary arrangement shortly after receiving the evacuation letter, but this arrangement is no longer viable. He cannot afford to live in a property comparable to his condominium. Like many others, the concrete floor of his condominium will need to be removed and replaced during repairs, and he will be unable to live in his condominium when this happens. The duration and cost prevent him from providing his family with their home or a safe alternative.

In summation, the following describes the plights of the remaining three Movants. Movant Ashley Caudill ("Caudill"), who could not afford to move after the evacuation recommendation, will nevertheless be unable to live in her home when the concrete floors of the condominium are being removed and replaced during repairs. Her future is unknown, but she risks potential exposure to perilous conditions. Movant Timothy Poe ("Poe") evacuated with his family and now pays $1,600 per month for a second residence while still being responsible for the mortgage and utilities at his condominium. He cannot afford to continue paying for both residences. The last Movant, Jill Herpy ("Herpy"), evacuated into a second residence. Herpy must pay the condominium

20

mortgage and apartment rent, as well as utilities at both locations. Herpy is on a tight budget and struggles to buy groceries.

In a hearing held on the Movants' motion for a temporary injunction, a structural engineer opined that the affected condominiums were unsafe and unsanitary for humans to reside in, citing issues with rodents, sewer, and the structural compromise of the building. The condominiums will continue to be unfit for human habitation until the repairs have been made. For all the Movants, it will be well over a year before their condominiums are returned to a livable condition.

Movants acted timely in seeking injunctive relief in the circuit court. They filed their initial complaint on July 30, 2024, four days after receiving the letter advising evacuation. Fifteen days later, Movants filed their initial motion for injunctive relief, less than three weeks since receiving the letter advising evacuation. The circuit court found no unreasonable delay in seeking relief, and noted an urgent need for relief as Movants' physical wellbeing and property interests were at stake.

The circuit court also found that the Movants faced an untenable choice: remain on the property and risk illness or even death, or leave to seek alternative housing, which for them carried the risk of foreclosure and inadequate food or shelter. Therefore, Movants were subjected to irreparable harm. For the reasons below, I would uphold the circuit court's grant of a temporary injunction.

21

**ANALYSIS**

**Standard of Review**

> Because the granting or denial of a temporary injunction under CR 65.04 is "addressed to the sound judicial discretion of the trial judge[,]" a party seeking interlocutory relief from a trial court's decision to grant or deny a temporary injunction bears an "enormous burden...." And an appellate court may not disturb a trial court's decision on a temporary injunction unless the trial court's decision is a clear abuse of discretion. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

*Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152, 162 (Ky. 2009)

(internal citations omitted).

**Irreparable Injury**

> A temporary injunction may be granted during the pendency of an action on motion if it is clearly shown by verified complaint, affidavit, or other evidence that the movant's rights are being or will be violated by an adverse party and the movant will suffer immediate and irreparable injury, loss, or damage pending a final judgment in
>
> the action, or the acts of the adverse party will tend to render such final judgment ineffectual.

CR 65.04.

> A court faced with a request for a temporary injunction must analyze the request on three levels. First, the trial court should determine whether plaintiff has complied with CR 65.04 by showing irreparable injury. This is a mandatory prerequisite to the issuance of any injunction. Secondly, the trial court should weigh the various equities involved. Although not an exclusive list, the court should consider such things as possible detriment to the public interest, harm to the defendant, and whether the injunction will merely preserve the status quo. Finally, the complaint should be evaluated to see whether a substantial question has been presented. If the party requesting relief has shown a probability of irreparable injury, presented a substantial question as to the merits, and the equities are in favor of issuance, the temporary injunction should be awarded. However, the actual overall merits of the case are not to be addressed in CR 65.04 motions.

22

*Thompson*, 300 S.W.3d at 161–62 (Ky. 2009).

The majority takes issue with the trial court's conclusion that Movants were facing irreparable harm. To repeat the majority, "An injury is irreparable if 'there exists no certain pecuniary standard for the measurement of the damages.'" *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642, 645 (Ky. 1992). "Injunctions, generally, will not be granted . . . where there is a choice between ordinary processes of law and the extraordinary remedy by injunction, when the remedy at law is sufficient to furnish the injured party full relief to which he is entitled in the circumstances." *Id.* "[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to prove irreparable harm. *Norsworthy v. Kentucky Bd. of Med. Licensure*, 330 S.W.3d 58, 62 (Ky. 2009). "[I]t is well established that economic and reputational injuries are generally not irreparable." *Id.* (citing *Zirkle v. District of Columbia*, 830 A.2d 1250, 1256–57 (D.C. 2003)).

> The majority concludes that irreparable harm did not exist here because
>
> [i]f [Movants] succeed in their suit against [Respondents], they will have the ability to recoup their financial losses from the damage to their homes and the financial strain placed upon them due to the expenses associated with temporarily relocating. Thus, a pecuniary standard exists to measure their damages, rendering the temporary interlocutory relief they requested and received inappropriate.

What the majority fails to explain is how money awarded in the future will remedy the loss of one's home, actual homelessness, or the threat of disease which is occurring now. While it is certainly true that the mere loss of property

23

does not constitute irreparable injury, Movants stand to have taken from them (by no fault, contract, or action of their own) more than property — they stand to lose their *home*.

Most, if not all, of the Movants cannot afford both their condominium payment and replacement housing. These Movants must choose between breaching their condominium promissory note to live elsewhere — resulting in inevitable foreclosure — or staying put, continuing to make payments, and risking serious health and safety hazards from exposure to sewage, rodents, insects, and cracked floors. Other Movants are faring even worse. The ones who have paid off their condominiums and adjusted their income accordingly stand to lose not just *a home*, they stand to lose *any home*, and homelessness looms over them. This injury isn't just hypothetical or speculative — Ellis is already living in conditions which rival homelessness. Those who could not afford to move out yet (at the expense of their health and safety) will nonetheless inevitably be forced to vacate while the concrete floors are being repaired. All in all, Movants are facing some combination of losing their home to foreclosure; not being able to afford alternative housing; unsafe, unsanitary, and unhealthy living conditions; or not having any form of shelter at all over their heads. All of this can be remedied by the injunctive relief granted by the circuit court. None of it can be remedied by monetary damages in the future.

For over a century, Kentucky law has recognized that destruction of one's home amounts to irreparable injury. *Smith v. W. Union Tel. Co.*, 83 Ky. 269, 273 (1885) ("If one is about to tear down my home, or waste and destroy my

24

property, so as to produce irreparable injury"); *Bishop v. Lovan*, 43 Ky. 116, 118 (1843) (finding that irreparable injury resulted from the statutorily permitted sale of land from private citizens who innocently acquired land without awareness that taxes were due on the land). Here, the damage to the Movants' homes has already been inflicted, so the temporary injunction would not be for the purpose of preventing further physical damage to the Movants' homes. However, the Movants still stand to lose their homes to foreclosure.

Where property is unique, it cannot simply be replaced by money. We recognize this through the availability of the unique remedy of specific performance in lieu of monetary damages. KRS 355.2-716 ("Specific performance may be decreed where the goods are unique or in other proper circumstances."). Typically, "equity will not decree specific performance of a contract for a sale of personal property because ordinarily there is an adequate remedy at law," but "[t]here is excepted, however, from this rule, that species of property which has a sentimental, peculiar, or unique value, such as heirlooms, family portraits, furniture, or curios, for the obvious reason that in those instances the deprivation is not compensable in damages." *Campbell v. Stiles*, 190 S.W.2d 347, 349 (Ky. 1945). In real estate law, we have recognized that each piece of real estate is unique, prompting the availability of specific performance. In *AEP Industries, Inc. v. B.G. Properties, Inc.*, 533 S.W.3d 674, 682 (Ky. 2017), we said:

> [H]ere the *res* subject to the order compelling specific performance is real estate. The *res* in dispute is not a fungible quantity of money; it is uniquely tangible land. Historically, laws governing the transfer

25

and exchange of land differ fundamentally from the laws governing the exchange of cash or its electronic equivalent. See, for example, *Baroi v. Platinum Condominium Development, LLC*, 874 F.Supp.2d 980, 984 (D. Nev. 2012) ("Nevada will enforce contractual obligations through the remedy of specific performance where appropriate, particularly in real estate transactions because real property is 'unique,' and damages therefore may be an inadequate remedy."); *In re Arnold and Baker Farms*, 177 B.R. 648, 661 (9th Cir. BAP 1994) ("each parcel of real property is unique"); *Consolidated Rail Corp. v. Michigan*, 976 F.Supp. 1085, 1089 (W.D. Mich. 1996) ("[I]nterference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."). The merger doctrine is itself an example of how the law applies special precautions to the conveyance of land that are not applicable to the transfer of money.

We allow for specific performance because we recognize that money is not a perfect substitute for real estate transactions, since no two pieces of real estate are the same. *Smith v. Williams*, 396 S.W.3d 296, 300 (Ky. 2012) ("[O]ur courts and the General Assembly have long recognized that [real] property is unique. . . . That principle was the motivation for the development of the remedy of specific performance in vendor/vendee law rather than simple money damages."). Anyone who has had the privilege of returning to their childhood home will understand the level of comfort, familiarity, nostalgia, and intimacy that money simply cannot replace. Once Movants' homes are gone, no amount of money will replace their exact homes, especially if a lawful foreclosure sale has occurred.

In fact, in many areas of the law, we have recognized the home as a revered place, worthy of special protections. Kentucky law allows for the defense of one's home through deadly force. KRS 503.055. Kentucky law regards the home as private and most worthy of protections against

26

unwarranted governmental intrusion. *Commonwealth v. Dixon,* 482 S.W.3d 386, 390 (Ky. 2016) ("An individual enjoys a reasonable expectation of privacy in the "curtilage," which is the area immediately surrounding a house that harbors the intimate activity associated with the sanctity of a man's home and the privacies of life."). Kentucky law recognizes tenancy by the entirety for married couples, a type of real property ownership which allows a surviving spouse to acquire full ownership of the home upon the death of their spouse and protects the home from the deceased spouse's creditors. KRS 381.050. Kentucky law protects a surviving spouse's share of the home through dower and curtesy, even if the deceased spouse tried to disinherit them. KRS 392.020.

Kentucky law also has a long tradition of protecting one's revered sanctuary through equitable remedies, including temporary injunctions, when the actions of another interfere with one's comfort and enjoyment of one's home, or where conditions caused by another lead to threats to health and safety. *See Barrett v. Vreeland,* 182 S.W. 605, 610 (Ky. 1916);[6] *Seifried v.*

---

[6] "Every citizen has a right to the free and unmolested enjoyment of the occupancy of his home, and included in this is the right to freedom from the consequences of any subtle influence being set in motion which interferes with this right, be it visible or invisible, and, as the proof in this case shows, in addition to the casting of rocks upon the premises of some of the appellees, such forcible vibrations in the air were produced by the explosions as to cause the shaking and jarring of their premises, their rights incident to the enjoyment of the property were seriously and irreparably interfered with."

*Hays*, 81 Ky. 377, 380–81 (1883).[7]  This is especially true when "one who seeks equity . . . come[s] into court with clean hands."  *Time Fin. Co. v. Varney*, 253 S.W.2d 233, 234 (Ky. 1952).  Here, while Movants were paying their mortgages, raising their young families, going to work, enjoying their retirement, whatever their individual case may be, these Movants had their homes pulled out from under them and knocked down around them.  The shifting hillside and the damage incurred essentially constructively evicted Movants from their homes — a place our jurisprudence has always recognized as sacred — but the financial obligations attached to their homes remained.  Through the pendency of this action, Movants are tied financially to a home that they cannot use.  In the meantime, their respective home lenders are still expecting to be repaid in accordance with the loan contract and credit reporting bureaus will report if Movants default on their loans. Finding lenders willing to assume the risk of losing money to injured parties awaiting the uncertain and indefinite outcome of a legal suit will prove challenging, if not impossible.  While this financial devastation might be partially remedied by a final award of monetary damages, the loss of one's home, the time spent without *any* home or shelter, and the health consequences or injuries suffered by staying in an unfit environment will not be remedied by an award of money in the future.

---

[7] "[W]hen the injury is irreparable, such as the pollution of the air with putrid carcasses or noxious odors, rendering his home or place of business unhealthy, or producing physical discomfort to the particular person, a court of equity will interfere."

28

Assuming arguendo that Movants could go out and repurchase a similar home after having received a monetary damages award, success is uncertain. Unfortunately for the Movants, their credit scores will not be immune from the deleterious effects of foreclosure. Even fortified with a monetary judgment, Movants may find themselves turned away from purchasing opportunities they would have enjoyed prior to the damage to their condominiums and their personal credit. Granted, we have recognized that "economic and reputational injuries are generally not irreparable." *Norsworthy v. Kentucky Bd. of Med. Licensure*, 330 S.W.3d 58, 62 (Ky. 2009). Arguably, damage to a credit score could be likened to a reputational injury. It is also true that at least *in theory*, a damaged credit score could be compensable in the monetary damages phase, and thus not a reason for finding irreparable injury. *Ison v. Robinson*, 411 S.W.3d 766, 772 (Ky. 2013) ("Injury or damage to credit or loss of credit rating has been recognized as a compensable damage in tort claims by Kentucky courts."). However, it is hard to see how one could reasonably be able to predict, at the time damages will be calculated in this action, the monetary value of the detriment Movants will face in reduced borrowing power for purchases happening in the future. This difficulty has been recognized in another Kentucky case from which we can draw analysis:

> How does one measure, in dollars, the negative impact on one's credit rating stemming from the erroneous report of an unpaid debt? Further, to what extent was [Appellant] damaged when he was denied credit as a result of the supposed unpaid judgment? The actual loss caused to [Appellant] is difficult to prove.

29

*Goetz v. Asset Acceptance, LLC*, 513 S.W.3d 342, 347 (Ky. App. 2016).

Kentucky case law indicating how damages for injured credit scores are to be predicted and calculated is scarce. However, *Crowder v. Rearden*, 296 S.W.3d 445, 449 (Ky. App. 2009), reflects the difficulty inherent in making such predictions. In *Crowder*, the trial court awarded (and the Court of Appeals upheld) the husband monetary damages for: the wife's share of the mortgage arrearage plus interest; any deficiency that may be assessed against the husband due to default caused by the wife; reimbursement for the husband's travel expenses from Florida to Louisville to attend the contempt hearing; any deficiency levied against the martial home as a result of the wife's failure to sign the listing agreement; attorney's fees; and a realtor's inspection fee. *Id.* Despite awarding monetary damages for this constellation of injuries, the trial court nevertheless ordered (and again, the Court of Appeals upheld) the wife "to serve thirty days in jail for destroying [husband]'s credit by not paying her portion of the house mortgage." *Id.* Undoubtedly, the trial court found monetary damages to be an unsatisfactory means for compensating a damaged credit score and instead chose a different route. In the situation at hand, where Movants will likely suffer a foreclosure and the subsequent damage to their credit score, monetary damages would be difficult to predict and compute. The trial court's temporary injunction would serve to mitigate the aforementioned damages to some extent.

Movants cite *Smith v. State Farm Fire & Casualty Co.*, 737 F. Supp. 2d 702 (E.D. Mich. 2010) as support for their contention that other courts in the 6th Circuit have found the loss of one's home to be irreparable harm for the purposes of injunctive relief. *State Farm* involved a motion for a temporary restraining order and preliminary injunctive relief in an action against an insurer by the insured concerning the extent of repairs needed to restore the insureds' fire- and smoke-damaged home. *Id.* at 705. The plaintiffs' home was extensively damaged by a fire, and the plaintiffs could not live in the home. *Id.* On its own accord, State Farm issued rent payments, made directly to the plaintiffs' new landlord, for alternative housing for the plaintiffs. *Id.* However, before the litigation reached a resolution, State Farm ceased the rent payments, citing unanticipated delays in the appraisal process which caused the payments to continue for longer than predicted. *Id.* As a result, the plaintiffs, who had few assets, fell behind on their rent and were served with a demand for possession by their landlord. *Id.* at 707. In considering the plaintiffs' motion for injunctive relief, the trial court found that the plaintiffs had a strong likelihood of success on the merits. *Id.* at 714. Most relevant to our discussion, the trial court also found irreparable harm in that the plaintiffs faced an imminent and real threat of being without an alternate housing option if the rent payments were not continued. *Id.* Specifically, Movants point out the following language from *State Farm* which supports the finding of irreparable harm:

[A] significant body of case law establishes that "in certain circumstances the 'threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the

first prong of the test for preliminary injunctive relief.'" *Baumgarten v. County of Suffolk*, No. 07–539, 2007 WL 1490487 at *5 (E.D.N.Y. Feb. 20, 2007) (citing *Tellock v. Davis*, No. 02–CV–4311, 2002 WL 31433589, at *7 fn. 2 (E.D.N.Y. Oct. 31, 2002) (citing *McNeill v. New York City Housing Authority*, 719 F.Supp. 233, 254 (S.D.N.Y.1989)); *Calvagno v. Bisbal*, 430 F.Supp.2d 95, 100 (E.D.N.Y.2006) (holding that plaintiffs will suffer irreparable harm by losing their only residence); *In re Slater*, 200 B.R. 491, 495 (E.D.N.Y.1996)). *See also Park Village Apts. Tenants Assoc. v. Mortimer Howard Trust*, No. 09–4780, 2010 WL 431458 at *3 (N.D.Cal. Feb. 1, 2010) (threat of homelessness and irreparable harm shown where rent increases and defendant's refusal to accept enhanced vouchers threatened eviction with no prospect of alternative low income housing).

*Id.* Lastly, the trial court found that a balance of the equities tips in favor of granting the plaintiffs' motion for injunctive relief. *Id.*

The majority's attempt to distinguish *Smith v. State Farm Fire & Casualty Co.*, 737 F. Supp. 2d 702 (E.D. Mich. 2010) fails. It is certainly true that the Sixth Circuit's holding in *State Farm* is not binding on this Court, but this Court has a long history of finding persuasive case law from the Sixth Circuit. Additionally, the logic behind the majority opinion's attempt to distinguish *State Farm* confuses the issues. Movants cite to *State Farm* for its demonstration that the realistic prospect of homelessness constitutes a threat of irreparable harm and satisfies the first prong of the test for preliminary injunctive relief. The majority opinion criticizes this, pointing out that "while the factors that must be considered to grant a temporary injunction under Michigan law are substantially similar to Kentucky's factors, Michigan does not consider any one factor to be a necessary "prerequisite." Essentially what the

majority says is that because Michigan does not require all factors to be met, the factors themselves are dissimilar. This logic is flawed. Whether a temporary injunction requires irreparable harm to be proven or not, what is sufficient or necessary to constitute irreparable harm does not change.

The majority also criticizes Movants' use of *State Farm* because, according to the majority, "unlike in the case before us, [*State Farm*] involved a temporary injunction motion to preserve the status quo by requiring the defendant to continue making payments it was already voluntarily making pursuant to a previously existing insurance contract." It is true that "[b]y its very nature, however, a temporary injunction is designed merely to hold the status quo until the merits can be decided." *Curry v. Farmers Livestock Mkt.*, 343 S.W.2d 134, 135 (Ky. 1961). However, the majority overlooks that the point of the injunction in the case at hand was to maintain the Movants' status quo — namely, to keep them housed and in legal ownership, if not possession, of their condominiums.

This brings me to my last point on the matter of irreparable harm. To maintain the status quo, Movants needed alternative, safe housing. SD1 contends that "monetary relief is not an equitable remedy which may be obtained through temporary injunction." This case is best viewed when it is understood that the monetary award was the circuit court's substitution of money for alternative housing during the pendency of the legal proceedings. Some Movants had already signed a lease on alternative housing, and

expecting the Respondents to collectively configure a plan for alternative housing for Movants, as the trial court noted, would likely lead to added delay.

The trial court, in its discretion, was trying to forge an efficient solution. The trial court did not abuse its discretion in awarding monetary damages in place of alternative housing, with the end goal being that the Movants secure alternative housing.

**Due Process**

The majority opinion expresses concern about the due process implications of upholding the circuit court's injunction, citing the holding in *PremierTox* which involved equitable implications in forcing a party to pay what amounts to monetary damages prior to any adjudication of that party's liability. *PremierTox 2.0 v. Miniard*, 407 S.W.3d 542 (Ky. 2013). *PremierTox* involved an underlying action in which a medical service provider claimed that Kentucky Spirit Health Plan, Inc. ("Kentucky Spirit"), a Medicaid health insurer, owed it money for services provided on behalf of Medicaid recipients. *Id.* at 544. Pending adjudication of the underlying action, the circuit court issued an order requiring Kentucky Spirit to deposit $1,880,293.46 into an escrow account controlled by the circuit court to prevent "significant financial harm to Kentucky citizens" in the event that Kentucky Spirit failed to pay sums ultimately determined to be due and owing". *Id.* The Court of Appeals issued a writ to prohibit enforcement of the circuit court's order, which this Court upheld. *Id.*

The majority contends that it is irrelevant to the due process analysis that *PremierTox* involved a writ of prohibition whereas the case at hand involves a temporary injunction. Yet, a temporary injunction requires things a writ of prohibition does not — a showing that the Movants are likely to win on the merits, a balancing of the equities, and a bond in the event that the party against whom the injunction was ordered was wrongfully enjoined and, therefore, could be entitled to compensatory damages.[8] *PremierTox* was concerned that "the circuit court will divest [the defendant] of its money without a due process adjudication of the validity of [the plaintiff]'s claims." *Id.* at 548. Unlike in the writ proceedings held in *PremierTox*, a temporary injunction requires "that there is a substantial possibility that the movant will ultimately prevail." *Price v. Paintsville Tourism Comm'n*, 261 S.W.3d 482, 484 (Ky. 2008). Here, the trial court listened to evidence spanning over three separate hearings before concluding that there was a substantial possibility that Movants would ultimately prevail, commenting to defense counsel at the beginning of the first hearing when questioned about the purpose behind the hearing that:

> Well, let me ask you this, because one of the things the Court has to do is there's a couple different components, as you all know. But one of the things I have to do, if I don't agree with you that this is an irreparable injury — this isn't just monetary damages — there is something more and they're entitled to injunction. The Court is also required to show that they're likely to succeed at trial. I don't know

---

[8] Under the class of writs pertinent in *PremierTox*, "a court may issue a writ of prohibition if the lower court is acting or is about to act erroneously, *and* the petitioning party has no adequate remedy on appeal or otherwise and would suffer a great injustice or irreparable injury if the writ was not issued." 407 S.W.3d at 546.

35

that. And if you want to stipulate they are going to be likely to succeed at trial and you all just want to talk about monetary damages, then I think that probably I might not need a lot of testimony on it. But I don't think you're inclined to agree that you're liable.

The majority concludes that *PremierTox*'s due process analysis applies to the case at hand, offering that both writs of prohibition and temporary injunctions are "extraordinary remedies and, if proceeding under the class of writ requiring that a lower court is acting within its jurisdiction but nevertheless acting erroneously, both necessitate a showing of irreparable harm." But it is not the irreparable harm in a temporary injunction analysis that does the heavy due process lifting — it is the finding that there is a substantial possibility that the movant will ultimately prevail. "The fundamental requirement of procedural due process is simply that all affected parties be given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Hilltop Basic Res., Inc. v. Cnty. of Boone*, 180 S.W.3d 464, 469 (Ky. 2005). No one disputes that Respondents received notice and a hearing before this injunction was awarded, and Respondents do not allege that either the notice or the hearing was somehow inadequate.

In Kentucky, we have a long history of upholding temporary injunctions prior to a final adjudication when the requirements of CR 65.05 are met. *PremierTox* does not create an exception where a trial court awards a monetary injunction as opposed to a non-monetary injunction. In either situation — a monetary temporary injunction or a non-monetary temporary injunction — a party is bound by law to either act or refrain from acting, without having

36

reached a final outcome on the merits of the case. Here, unlike in *PremierTox*,

the circuit court's injunction was **not** an early award of damages. Again, the

injunction is best viewed as a means of providing alternative housing for the

Movants to prevent probable homelessness and/or financial ruin due to the

loss of their homes, not as a means of putting the anticipated grant of damages

into escrow, or as a means to alleviate the fears inherent in the uncertain

financial circumstances of the defendant, as was the case in *PremierTox*.

Ultimately, the Respondents here received due process under the

circumstances, and *PremierTox* is clearly distinguishable from this situation.

**Bond**

"CR 65.05 requires the party in whose favor the injunction is granted to

post a bond and wrongfully enjoined parties may recover compensatory

damages." *Nat'l Collegiate Athletic Ass'n v. Lasege*, 53 S.W.3d 77, 88 (Ky.

2001).

> No restraining order or temporary injunction shall be granted except
> upon the giving of a bond by the applicant, with surety, in such sum
> as the court or the officer to whom application is made deems
> proper, for the payment of such costs and damages as may be
> incurred or suffered by any person who is found to have been
> wrongfully restrained or enjoined. The address of the surety shall be
> shown on the bond.

CR 65.05(1). "Th[is] rule unquestionably requires that a bond accompany an

order granting temporary injunction relief, and the trial court erred when it

[issued an injunction] without requiring [the party seeking injunctive relief] to

post a bond sufficient in amount to protect [the party against whom the

injunction was ordered]." *Lewis LP Gas, Inc. v. Lambert*, 113 S.W.3d 171, 177

37

(Ky. 2003), *abrogated on other grounds by Hoskins v. Maricle,* 150 S.W.3d 1 (Ky. 2004). The trial judge is to set the bond at an amount sufficiently proportionate to compensate the party against whom the injunction is issued should that party ultimately prevail at trial or be found to be liable for less than the amount paid under the injunction order. *See Gering v. Brown Hotel Corp.,* 396 S.W.2d 332, 335–37 (Ky. 1965).

Here, the trial court issued its temporary injunction order without having set a bond. Under most circumstances, failure to issue a bond is fatal. However, here, the parties agreed to waive the bond, in an agreed order tendered to the trial court:

<u>AGREED ORDER AS TO BOND</u>
Per agreement of the Parties, there shall be no requirement for the posting of a bond by any Party related to the Court's Injunction Order dated June 5, 2025 and/or the appeal thereof until fourteen (14) days after the Court of Appeals issues its ruling.

SD1 acknowledges, in its Response to Movants' Motion to Vacate and/or Modify the Kentucky Court of Appeals' Order Dissolving Injunction, that the agreed order "was an effort by the parties to maintain the status quo while the Injunction Order was under appellate review." This much is supported by the fact that Movants tendered another agreed order on the same day in which Movants agreed to stay enforcement of the injunction pending the outcome of the appeal. Both parties agreed to give up a right in order to facilitate the speedy process, keeping in mind that the situation grows more dire for Movants as each day passes. Certainly, the Movants are motivated to reach a quick resolution.

38

What's more is that SD1 represented to the trial court that "[s]hould the Court stay enforcement of the Injunction Order pending review by the Court of Appeals, the issue of a bond need not be addressed unless and until the Injunction Order is affirmed by the reviewing Court(s)." SD1 now reverses course by raising the issue of bond as a reason to render the Injunction Order ineffective, despite having agreed to waive the bond issue and despite the Injunction Order having not been affirmed by the Court of Appeals.

In its Order Granting Interlocutory Relief, the Court of Appeals did not acknowledge or reference the parties' agreement to waive the bond requirement until after the Court of Appeals had rendered its decision. Because of this, it is difficult to know whether the parties' agreed waiver was of any relevance to their holding on this issue. Nevertheless, the Court of Appeals held the failure to issue a bond to be "fatal to enforcement [of] the trial court's temporary injunction." However, just several months ago, the Court of Appeals was faced with a similar situation in which an injunction order lacked a bond. The Court of Appeals, which had declined to dissolve the injunction, "directed the trial court to conduct a hearing to determine an appropriate bond amount" and, once that determination was made, required the party seeking an injunction to post a bond in that amount, with appropriate surety in accordance with CR 65.05(1). *Svestka v. Oakes*, No. 2024-CA-0748-MR, 2025 WL 1415813, at *2 (Ky. App. May 16, 2025). I think this is the more prudent course. In moving forward with these proceedings, I would follow the Court of Appeals' precedent

39

in *Oakes* and remand to the trial court with instructions to order a bond in compliance with CR 65.05(1).

**Limitations of this Holding**

Lastly, I would clarify that this opinion is limited to the facts of this situation. Only in a situation where an alleged tortfeasor damages an alleged victim's home to the extent that remaining in the home poses a risk to the victim's health and safety, and where the victim faces constructive eviction from that home which could result in either homelessness or the loss of their home, would temporary injunctive relief be appropriate. Additionally, all other requirements of a temporary injunction in our Rules of Civil Procedure and case law must be met. This holding would in no way change the course of our jurisprudence in relation to foreclosure actions based upon default or other contractually related matters. This set of facts is one crying out for equitable relief, and this cry is one in which our courts of justice are already equipped to hear.

**CONCLUSION**

For the reasons stated above, I would vacate the Court of Appeals' order granting interlocutory relief to Respondents and reinstate the temporary injunction order issued by Campbell Circuit Court. However, because the trial court did not set a bond in accordance with CR 65.05 in its temporary injunction order, I would direct the trial court to conduct a hearing to determine an appropriate bond amount and, once that determination was

made, direct the trial court to require Movants to post a bond in that amount, with appropriate surety in accordance with CR 65.05(1).

Thompson, J., joins.

ENTERED: FEBRUARY 19, 2026

_Debra Hembree Lambert_
CHIEF JUSTICE